**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 12 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

DOUGLAS CHRISTOPHER GAY, JR.,

      Defendant-Appellant.

No. 00-6099

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 99-CR-171-R)**

---

Timothy W. Ogilvie (Daniel G. Webber, Jr., United States Attorney, with him on the brief), Assistant United States Attorney, Oklahoma City, Oklahoma, for Plaintiff-Appellee.

William P. Earley, Assistant Federal Public Defender, Oklahoma City, Oklahoma, for Defendant-Appellant.

---

Before **BRORBY, PORFILIO** and **BALDOCK**, Circuit Judges.

---

**BRORBY**, Circuit Judge.

---

Appellant Douglas Christopher Gay, Jr. entered a conditional guilty plea to possession of cocaine base with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and possession of a firearm after conviction of a felony offense, in violation of 18 U.S.C. § 922(g)(1). Mr. Gay's conditional plea reserved the right to appeal the district court's denial of his motion to suppress evidence. The district court sentenced Mr. Gay to 235 months imprisonment, with a four-year term of supervised release, and a $200.00 special assessment. On appeal, Mr. Gay challenges the district court's denial of his motion to suppress and the court's sentencing calculation under United States Sentencing Guideline (U.S.S.G.) § 4B1.1 career offender provision. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

FACTUAL BACKGROUND

The facts in this case are not in dispute. In 1997, an Oklahoma City police officer apprehended Mr. Gay who, at the time of his arrest, held several plastic bags containing approximately fifty-three grams of cocaine base. As the result of an investigation, authorities determined Mr. Gay was "fronted" nine ounces, or 255.15 grams, of cocaine base from another individual, and Mr. Gay had sold all but the fifty-three grams found in his hand at the time of his arrest. Thereafter, Mr. Gay apparently fled while on bail, and for two years the United States

-2-

Marshal Service made numerous attempts to locate and arrest Mr. Gay, based on an outstanding 1997 Drug Enforcement Agency arrest warrant issued for Mr. Gay. In 1999, Deputy McNeil, with the United States Marshal Service, learned from an informant Mr. Gay lived with a relative – possibly his uncle – in Shawnee, Oklahoma. Informants from the Shawnee Police Department and the District Attorney Narcotics Task Force told Deputy McNeil the uncle was a known drug dealer and that possibly a relative involved in the drug business lived with him.

Law enforcement agents obtained a state search warrant for the uncle's West Kirk Street residence, which authorized the agents to search the residence for both Mr. Gay and any drugs and firearms. On the morning of August 3, 1999, Deputy McNeil and other law enforcement agents[1] (hereinafter "officers") executed the search warrant at the West Kirk Street residence, but did not find Mr. Gay. The same morning, a confidential informant at that residence told the officers Mr. Gay presently dealt drugs and was "armed at all times."[2]

---

[1] The arresting law enforcement agents include, among others, Deputy United States Marshals and an officer with the Oklahoma County sheriff's department.

[2] The officers engaged in a face-to-face conversation with the informant. In addition, several other informants told the agents Mr. Gay was armed at all times.

Furthermore, the informant divulged Mr. Gay did not live with, but frequently visited, his uncle at the West Kirk Street residence. The confidential informant knew, from personal experience and numerous visits, Mr. Gay lived approximately two miles away on Pottinger Street. Soon after disclosing the location of Mr. Gay's current residence, the informant accompanied the officers to Pottinger Street, showed them the location of the house, pointed out the duplex, and told the officers Mr. Gay was presently in his home.

Some time between nine and ten in the morning, and within five minutes of learning the location of Mr. Gay's current residence, Deputy McNeil knocked on the door of the Pottinger Street residence and shouted "police." Deputy McNeil immediately heard a "thud" from inside the residence. After two or three seconds, another officer twice kicked on the door to effect a forcible entry. The officers entered the residence and found Mr. Gay standing just inside the door. A gun was at his feet. The officers found 2.49 grams of crack cocaine in plain view on the couch. After the officers arrested Mr. Gay and advised him of his rights, he admitted he owned the gun and cocaine base.

A grand jury indictment charged Mr. Gay in Count 1 with possession of cocaine base with intent to distribute on March 5, 1997, in violation of 21 U.S.C.

§ 841(a)(1); in Count 2 with possession of cocaine base with intent to distribute on August 3, 1999, in violation of 21 U.S.C. § 841(a)(1); in Count 3 with possession of a firearm in connection with the 1999 drug trafficking crime; and in Count 4 with possession of a firearm on August 3, 1999 after conviction of a felony offense, in violation of 18 U.S.C. § 922(g)(1). [3]

Mr. Gay filed a motion in district court to suppress evidence challenging, among other things: (1) the officers' use of the unknown confidential informant to form their reasonable belief that Mr. Gay resided in, and was within the dwelling at the time of entry; and (2) the officers' unreasonable knock and announce before forcibly entering the Pottinger Street residence. The district court held a suppression hearing and overruled Mr. Gay's motion. Mr. Gay entered a conditional guilty plea to Counts 2 and 4 of the Indictment, while reserving the right to appeal the district court's denial of his motion to suppress evidence. The district court then sentenced Mr. Gay to 235 months imprisonment on Count 2, a concurrent 120-month imprisonment on Count 4, a four-year term of supervised release, and a $200.00 special assessment. Mr. Gay appeals the district court's denial of his motion to suppress evidence, and challenges the

---

[3] Pursuant to a plea agreement, the government dismissed Counts 1 and 3 of the Indictment, including the 1997 count.

district court's sentencing calculation under U.S.S.G. § 4B1.1 career offender guideline.

## STANDARD OF REVIEW

In reviewing the denial of a motion to suppress, this court considers the totality of the circumstances and views the evidence in the light most favorable to the government. *United States v. Long*, 176 F.3d 1304, 1307 (10th Cir.), *cert. denied*, 528 U.S. 921 (1999). We accept the district court's findings of facts unless clearly erroneous. *United States v. Green*, 178 F.3d 1099, 1104 (10th Cir. 1999). "A district court's factual finding is clearly erroneous only 'if it is without factual support in the record or if this court, after reviewing all the evidence, is left with a definite and firm conviction that a mistake has been made.'" *United States v. Patron-Montano*, 223 F.3d 1184, 1188 (10th Cir. 2000) (alteration omitted) (quoting *Manning v. United States*, 146 F.3d 808, 812 (10th Cir. 1998)). "The ultimate determination of reasonableness under the Fourth Amendment is a question of law we review de novo, considering the totality of the circumstances." *United States v. Dickerson,* 195 F.3d 1183, 1186 (10th Cir. 1999).

# DISCUSSION

## I. Motion to Suppress

Mr. Gay does not dispute the validity, or the underlying probable cause, of his 1997 outstanding arrest warrant. Moreover, Mr. Gay acknowledges, as he must, an officer has limited authority based on the arrest warrant to enter a dwelling where the suspect resides. *See Payton v. New York*, 445 U.S. 573, 603 (1980). However, Mr. Gay suggests officers could not lawfully enter the Pottinger Street residence without a search warrant supported by probable cause because it was not his home, but a third person's home. Accordingly, he asserts a *Steagald*,[4] rather than *Payton*, analysis should apply to the facts of this case. We disagree.

In *Payton*, the Supreme Court recognized the common law maxim "every man's house is his castle" is part of our Fourth Amendment jurisprudence prohibiting unreasonable searches and seizures. *Payton*, 445 U.S. at 590, 597 n.45 (stating the Fourth Amendment draws a "firm line at the entrance to the house [and] [a]bsent exigent circumstances, that threshold may not reasonably be crossed without a warrant"). Although searches and seizures inside a home

---

[4] *Steagald v. United States*, 451 U.S. 204, 205-6 (1981).

without a search warrant are presumptively unreasonable, "an arrest warrant founded on probable case implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton*, 445 U.S. at 603.

In contrast, the Supreme Court held in *Steagald* that absent exigent circumstances or consent, law enforcement officers could not legally search for the subject of an arrest warrant in the home of a third party without first obtaining a search warrant. *Steagald*, 451 U.S. at 205-06. Nevertheless, the *Steagald* Court reiterated the principle articulated in *Payton* that "an arrest warrant alone will suffice to enter a suspect's own residence to effect his arrest." *Id.* at 221.

In a *Payton* analysis, this court recognizes a two-prong test: officers must have a reasonable belief the arrestee (1) lived in the residence, and (2) is within the residence at the time of entry. *Valdez v. McPheters*, 172 F.3d 1220, 1224-25 (10th Cir. 1999) (rejecting argument "reasonable belief" standard is the equivalent of "probable cause"). Thus, whether *Steagald* or *Payton* applies is resolved under the first prong of the *Payton* test. For the following reasons, we conclude the *Payton* analysis applies.

*A. Reasonable belief arrestee lives in the residence*

To satisfy the first prong of the *Payton* test, the officers must reasonably believe Mr. Gay lived in the Pottinger Street residence at the time of entry. We recognize the "officers' belief need not prove true in fact[;] it is sufficient if the belief was objectively reasonable at the time of entry." *Valdez*, 172 F.3d at 1225. In addition, Mr. Gay need not actually live in the Pottinger Street residence, so long as he "possesses common authority over, or some other significant relationship to, the residence entered by police." *Id*. (quotation marks omitted). As we noted in *Valdez*, "people do not live in individual, separate, hermetically sealed residences[, but] live with other people[;] they move from one residence to another." *Id*.

Mr. Gay argues an officer's reasonable belief cannot be based on information acquired from an unknown confidential informant. Mr. Gay cites *Florida v. J.L.*, 526 U.S. 266, 120 S. Ct. 1375 (2000) as support for his argument a "bald assertion" from an unknown informant fails to demonstrate the informant's basis of knowledge or veracity. In *J.L.*, the Court held "an anonymous tip that a person is carrying a gun, without more" does not give rise to a reasonable suspicion justifying a stop and frisk. 120 S. Ct. at 1377-79. This is because an anonymous tip alone lacks the moderate indicia of reliability necessary

-9-

to justify reasonable suspicion. *Id.* at 1379-80.

The *J.L.* case is legally and factually distinguishable from this one. To satisfy the *Payton* test the officers must have a "reasonable belief" the arrestee lives in the residence, not a "reasonable suspicion" necessary to justify a "stop and frisk" under *Terry v. Ohio*, 392 U.S. 1 (1968). *See United States v. Clayton*, 210 F.3d 841, 844 n. 3 (8th Cir. 2000) (distinguishing "reasonable belief" from "reasonable suspicion"). These are two different legal standards. Nevertheless, we note the officers in this case, unlike in *J.L.*, rely on more than an anonymous tip. The officers engaged in a face-to-face discussion with the informant, who knew Mr. Gay was currently involved in criminal activity, told the officers the location of the residence based on personal knowledge, personally accompanied the officers to the residence, pointed at the dwelling, and presumably remained accountable if the tip was fabricated. *See United States v. Salazar*, 945 F.2d 47, 50-51 (2d Cir. 1991) ("[A] face-to-face informant must, as a general matter, be thought more reliable than an anonymous telephone tipster, for the former runs the greater risk that he may be held accountable if his information proves false."), *cert. denied*, 504 U.S. 923 (1992). Based on the evidence as a whole, we find the officers could reasonably rely on the confidential informant's personal knowledge concerning Mr. Gay's residence; thus, the officers possessed an objectively

-10-

reasonable belief Mr. Gay lived at the Pottinger Street residence at the time of entry. [5]

*B. Reasonable belief arrestee is within the residence*

Under the second prong of the *Payton* test, the officers must reasonably believe Mr. Gay was within the residence or present at the time of entry. We recognize we "must be sensitive to common sense factors indicating a resident's presence." *Valdez*, 172 F.3d at 1226 (quotation marks omitted). The officers are not required to actually view the suspect on the premises. *Id*. "Indeed the officers may take into account the fact that a person involved in criminal activity may be attempting to conceal his whereabouts." *Id*.

In this case, the officers relied on the confidential informant to form their belief Mr. Gay was within the dwelling at the time of entry. The informant, who knew Mr. Gay personally, knew of his drug selling activities, and visited the Pottinger Street residence on numerous occasions, explicitly told the officers Mr. Gay was currently in his home. Soon after the confidential informant told them of

---

[5] Although Mr. Gay admitted he lived at the Pottinger Street residence for approximately two months prior to arrest, we will not consider the admission in our examination of the arresting officers' reasonable belief because it was acquired after entry into the duplex. *See Valdez*, 172 F.3d at 1226 n.3.

Mr. Gay's presence, Deputy McNeil knocked loudly on the front door of the residence and heard a thud from inside the home, which suggested to him a person was inside the duplex at that time. After hearing the thud, the officers forcibly entered the Pottinger Street residence. Here, too, because the officers received information concerning Mr. Gay's whereabouts in a face-to-face encounter with the informant, we hold the officers could rely on the same informant's tip Mr. Gay was within the residence at the time of entry.

Viewing the evidence in the light most favorable to the government, as we must, and considering the totality of the circumstances, we hold the officers reasonably believed Mr. Gay lived in the residence and was within the residence at the time of entry. *See Long*, 176 F.3d at 1307.

*C. Knock and Announce Requirement*

Mr. Gay asserts the officers' failure to properly "knock and announce" their presence and purpose before seeking entry into Mr. Gay's residence renders the ensuing arrest and seizure of evidence constitutionally unreasonable. The federal "knock and announce" statute, which applies to the execution of both an arrest and search warrant, provides:

> The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a

search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

18 U.S.C. § 3109; *see Miller v. United States*, 357 U.S. 301, 308-309 (1958). "If the occupants do not admit the officers within a reasonable period of time, the officers may be deemed to be constructively refused admittance, and they may then enter by force." *United States v. Moore,* 91 F.3d 96, 98 (10th Cir. 1996) (questioning whether, in the absence of exigent circumstances, three seconds between announcement and entry is constructive refusal); *but see United States v. Jenkins*, 175 F.3d 1208, 1213 (10th Cir.) (dismissing a bright-line rule for time that must elapse between announcement and entry), *cert. denied*, 528 U.S. 913 (1999). In this case, we need not decide whether the two or three seconds that elapsed between the officers' announcement and their entry was a reasonable period of time under 18 U.S.C. § 3109 because we agree with the district court that exigent circumstances permitted the officers' immediate entry.

D. *Exigent Circumstances*

Unquestionably, the presumption in favor of announcement gives way when exigent circumstances exist. *United States v. King*, 222 F.3d 1280, 1285 (10th Cir. 2000). Exigent circumstances exist when officers are presented with an emergency situation, including threat of physical violence. *See Moore*, 91 F.3d at

-13-

98. "In order to justify a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile." *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997). We are mindful "[t]he mere statement that firearms are present, standing alone, is insufficient. The government must go further and demonstrate that the presence of firearms raised a concern for the officers' safety." *Moore*, 91 F.3d at 98.

In this case, the district court held exigent circumstances existed because the arresting officers obtained information from multiple informants that Mr. Gay carried a weapon at all times, currently dealt drugs, and recently parrticipated in a shootout with the police . According to the district court, these facts suggest the officers faced a threat of physical violence such that knocking and announcing their presence may have jeopardized their lives and safety.

On appeal, Mr. Gay argues the officers did not possess reasonable suspicion that knocking and announcing their presence would be dangerous. He contends the officers lacked reasonable suspicion of his dangerousness because the only information available to the officers involved his past shoot out with police and unsubstantiated hearsay from multiple informants. As support for his

argument, Mr. Gay cites to *United States v. Stewart*, 867 F.2d 581, 584 (10th Cir. 1989), in which we stated:

> The conclusion of exigency ... must be especially clear ... where there was no knock or warning whatsoever, where there was no information as to who was in the house, where the destruction of physical property took place, and where the occupants of the residence could be injured as a result of the entry.

*Id.* In *Stewart,* the officers believed the defendant was dangerous because an informant under the influence of marijuana told another informant he once saw the defendant with a semi-automatic pistol. *Id.* at 585. Based on little more than that statement, the Denver S.W.A.T. team forcibly entered the defendant's home, without knocking and announcing their presence, used a battering ram and detonated a stun grenade upon entry. *Id.* at 583.

The facts in this case, to say the least, are distinguishable. The quality and quantity of the officers' information regarding Mr. Gay's dangerousness is significantly greater than the information in *Stewart*. Here, the officers relied on at least four informants who each corroborated that Mr. Gay was armed at all times. In addition, Deputy McNeil learned from another agent, and the Tulsa police department confirmed, Mr. Gay participated in a police shoot-out two years prior to his 1999 arrest. In discussing the events of the shoot-out, Tulsa police told Deputy McNeil that Mr. Gay admitted he would involve himself in another

-15-

shoot-out with police to avoid jail. Moreover, the circumstances surrounding the forcible entry into the Pottinger Street residence are less extreme than those in *Stewart* . In this case, the arresting officers knocked, announced "police," waited two or three seconds, heard a thud, and twice kicked, rather than rammed, the door before entering. After carefully reviewing the transcript of the suppression hearing, we conclude the district court's factual findings are not clearly erroneous, are fully supported by the evidence, and this court is not left with a "definite and firm conviction that a mistake has been made." *Patron-Montano* , 223 F.3d at 1188 (quotation marks and citation omitted). Based on these facts, we hold exigent circumstances justified the officers' forcible entry into Mr. Gay's Pottinger Street residence.

## II. CAREER OFFENDER SENTENCING

On appeal, Mr. Gay does not dispute the district court's finding he is a career offender within the meaning of U.S.S.G. § 4B1.1, but instead challenges the court's sentencing calculation under the career offender provision. In order to understand the basis of Mr. Gay's appeal, a brief recitation of the probation officer's sentencing computation, which the district court adopted, is necessary.

The probation officer found Mr. Gay accountable for a total 257.64 grams

of cocaine base, based on the 255.15 grams, or nine ounces, he was "fronted" in 1997,[6] and the 2.49 grams he possessed when arrested in 1999. Under the Sentencing Guidelines, Mr. Gay's base offense level for 257.64 grams of cocaine base is 34. [7] The probation officer added two levels, pursuant to Sentencing Guideline § 2D1.1(B)(1), because Mr. Gay possessed a firearm during the offense, resulting in a base offense level of 36. The probation officer then reduced by three levels, pursuant to Sentencing Guidelines § 3E1.1(a)-(b), because Mr. Gay accepted responsibility and assisted authorities, resulting in a total offense level of 33.

Mr. Gay's initial criminal history category was IV. However, Mr. Gay satisfies the § 4B1.1. career offender guideline requirements because he was at least eighteen years old at the time he committed the instant offense, which

---

[6] Although the government dismissed Mr. Gay's 1997 drug possession and distribution count, pursuant to a plea agreement, the probation officer used the nine ounces of cocaine base to calculate his offense level. We recognize a sentencing court may consider drug quantities from dismissed counts as relevant conduct, under § 1B1.3(a)(1)(B). *See United States v. McGee*, 7 F.3d 1496, 1499 (10th Cir. 1993). On appeal, Mr. Gay does not contest the probation officer's calculation of his total amount of cocaine base.

[7] The Drug Quantity Table in U.S.S.G. § 2D1.1(c)(3) provides a base offense level of 34 for "[a]t least 150 [grams] but less than 500 [grams] of Cocaine Base."

involved a controlled substance, and had been convicted of at least two prior crimes of violence. *See* U.S.S.G. § 4B1.1. Thus, the probation officer assigned Mr. Gay a criminal history category VI, pursuant to § 4B1.1 which requires category VI in "every case." [8] *Id.*

The probation officer also explained § 4B1.1 provides an alternative method for calculating a career offender's base offense level. The § 4B1.1 base offense level must be applied if it is greater than the offense level calculated under § 2D1.1. *Id.* Mr. Gay's § 4B1.1 base offense level is 34 because the maximum statutory penalty for his violation of 21 U.S.C. § 841(b)(1)(B)(iii) is forty years. [9] Because Mr. Gay's base offense level of 36 under § 2D1.1 is greater than his offense level of 34 under § 4B1.1, [10] the probation office calculated Mr. Gay's sentence applying the § 2D1.1 base offense level. *Id*.

------

[8] Before application of the career offender guideline, Mr. Gay's criminal history category was IV.

[9] Section 4B1.1 provides an offense level of 34 if the offense statutory maximum is twenty-five years or more, but less than life imprisonment. *Id.*

[10] The career offender guideline permits a decrease under § 3E1.1. Because Mr. Gay accepted responsibility and assisted authorities, the probation officer deducted three levels from Mr. Gay's career offender base offense level of 34. Thus, his total offense level under § 4B1.1 is 31.

The district court adopted the probation officer's sentencing calculation, which combined the adjusted § 2D1.1 offense level (33) to the criminal history category VI specified in § 4B1.1 and resulted in a sentencing range of 235 to 293 months imprisonment. *See* U.S.S.G. Chapter 5 (Sentencing Table). The district court sentenced Mr. Gay to 235 months in prison.

On appeal, Mr. Gay argues the district court applied a piecemeal, and ultimately higher, sentence by using the greater § 2D1.1 offense level with the § 4B1.1 criminal history category. Mr. Gay contends that because the district court did not apply the offense level listed in the career offender guideline, the higher criminal history category VI also may not be applied. Stated differently, Mr. Gay asserts the district court erred because the "career offender provision must be applied *in toto*, or not at all."

We review the district court's factual findings regarding sentencing for clear error and review its legal interpretation of the Sentencing Guidelines *de novo*. *United States v. Maldonado-Acosta*, 210 F.3d 1182, 1183 (10th Cir. 2000). The § 4B1.1 career offender provision states, in relevant part: "If the offense level for a career criminal from the table below is greater than the offense level otherwise applicable, the offense level from the table below shall apply. A career offender's

-19-

criminal history category in every case shall be Category VI." U.S.S.G. § 4B1.1 (2000). The table specified in the provision contains offense levels geared to the maximum sentence under the statute of conviction. [11] In enacting § 4B1.1, Congress intended career offenders to "receive a sentence of imprisonment at or near the maximum term authorized." U.S.S.G. § 4B1.1 comment. (backg'd) (quotation marks omitted).

This court has stated the guidelines must be interpreted as if they were a statute or court rule. *United States v. Checora*, 175 F.3d 782, 790 (10th Cir. 1999). As with general statutory interpretation, "our analysis must begin with the language of the guidelines in question." *United States v. Smith*, 900 F.2d 1442, 1446 (10th Cir. 1990). "The guidelines, as criminal statutes, are 'given their fair meaning in accord with the manifest intent of the lawmakers.'" *United States v. Mojica*, 214 F.3d 1169, 1171 (10th Cir. 2000) (quoting *United States v. Moore*, 423 U.S. 122, 145 (1975)).

It is evident § 4B1.1, adopted for the purpose of enhancing the sentences for career offenders, articulates two opposed offense levels. The first offense level is

---

[11] In this case, the statute of conviction, § 841(b)(1)(B)(iii), sets the maximum sentence at forty years.

that listed in the career offender table; the second is the "otherwise applicable" Chapter Two offense level. *See* U.S.S.G. § 4B1.1. The career offender guideline plainly directs the sentencing court to apply the listed career offender offense level if it is greater than the offense level otherwise applicable. Based on the "fair meaning" of § 4B1.1, it logically follows that if the "otherwise applicable" ( *ie*., Chapter Two) offense level is greater, then the sentencing court must apply that offense level. *See Mojica* , 214 F.3d at 1171. Our reading of § 4B1.1 and its explanatory background notes is consistent with the legislatures' manifest intent for offenders with a career criminal background to receive at or near the maximum sentence authorized, and the fact § 4B1.1 is intended as a sentence enhancement. *United States v. Robinson* , 935 F.2d 201, 206 (11th Cir. 1991), *cert. denied* , 502 U.S. 1037 (1992); *see also* U.S.S.G. § 4B1.1 comment. (backg'd).

Additionally, our holding is in accord other circuits' case law. The Eleventh Circuit, when confronted with a similar question, stated, "[i]t would appear the negative corollary of [§ 4B1.1] must also apply; *i.e.* , if the offense level from the career offender table is less than the otherwise applicable offense level, the greater of the offense levels shall apply." *Robinson* , 935 F.2d at 205-06. *See United States v. Marrone* , 48 F.3d 735, 740 n.9 (3d Cir.) ("A career offender's offense level is the greater of the offense level applicable to the underlying conduct or the

appropriate offense level specified in section 4B1.1. A career offender automatically receives a criminal history category of VI."), *cert. denied*, 516 U.S. 836 (1995). For the reasons stated, we hold Mr. Gay's "otherwise applicable" offense level, under § 2D1.1, applies because it is greater than his career criminal offense level.

However, our resolution of the applicable offense level does not end our inquiry. We now must resolve Mr. Gay's appropriate criminal history category. Mr. Gay contends his criminal history category is inextricably intertwined with his applicable offense level. Thus, he suggests the sentencing court may only apply the specified § 4B1.1 criminal history category VI if that court also uses the listed career offender offense level. We reject such a constrained reading of § 4B1.1.

This court has previously noted the structure of the Sentencing Guidelines suggests that the criminal history category is to be determined independently of the offense level and "without regard to the nature of the crime for which the defendant is currently being sentenced." *United States v. Goldbaum,* 879 F.2d 811, 813 (10th Cir. 1989). Therefore, Mr. Gay's contention the automatic criminal history category is dependent on the offense level listed in the career offender table is erroneous. The plain language of § 4B1.1 requires criminal history

-22-

category VI in "every case." We read this to mean the sentencing court must employ Category VI regardless of which offense level is applied. Congress provided no exceptions to the mandatory criminal history category, and we find it difficult to believe Congress intended an alternative criminal history to apply to a career offender. This court recognizes "[t]he automatic placement of a career offender in criminal history category VI under U.S.S.G. § 4B1.1 reflects the Commission's assessment that the offender possess the most serious criminal history and the highest possible likelihood of recidivism." *United States v. Collins*, 122 F.3d 1297, 1304 (10th Cir. 1997). For the reasons stated, we hold the district court did not err in applying the "otherwise applicable" § 2D1.1 offense level with the career offender criminal history category VI.

Although Mr. Gay cites no case law to support his argument, he suggests § 1B1.5 requires the sentencing court to apply the career offender guideline in its entirety. Section 1B1.5 generally provides guidance on how to apply a guideline referenced in another guideline. *See* U.S.S.G. § 1B1.5. Mr. Gay asserts § 1B1.5 requires "that if a cross-reference to another [offense] guideline is used, then the entire [offense] guideline shall be used." However, Mr. Gay's argument excludes relevant commentary, and ultimately attempts to inject a cross-reference term into the plain language of the guideline.

"The intent of the Sentencing Commission is demonstrated in part through its commentary. District courts are obliged to follow the explanatory application notes unless they are plainly erroneous, inconsistent with the guidelines, or violative of the Constitution or a federal statute." *Mojica*, 214 F.3d at 1171. The "commentary explains the guidelines and provides concrete guidance as to how even unambiguous guidelines are to be applied in practice." *United States v. Pedragh*, 225 F.3d 240, 244 (2d Cir. 2000) (quotation marks and citation omitted).

Mr. Gay disregards the commentary to § 1B1.5 which acknowledges a "cross-reference," or instruction to apply another offense guideline, is typically labeled as such. The commentary states "[r]eferences to other offense guidelines are most frequently designated 'Cross References,' but may also appear in the portion of the guideline entitled 'Base Offense Level' ..., or 'Specific Offense Characteristics.'" U.S.S.G. § 1B1.5. It is clear the career offender provision contains no "cross reference" designation, and does not appear in the portion of the guideline entitled "Base Offense Level" or "Specific Offense Characteristic." Thus, § 4B1.1 does not "cross reference," as defined by § 1B1.5, another guideline provision by merely stating an "otherwise applicable" offense level may apply. *Compare* U.S.S.G. § 4B1.1 *with* §§ 2D1.1(d), 2D2.1(b), 2A4.1(c).

As an alternative argument, Mr. Gay asserts we should invoke the rule of lenity because the district court suggested his sentence under the career offender guideline is a "close question." The rule of lenity requires courts to interpret ambiguous statutes, including the Sentencing Guidelines, in favor of criminal defendants. *Ladner v. United States*, 358 U.S. 169, 178 (1958); *United States v. Blake*, 59 F.3d 138, 140 (10th Cir.) (applying the rule of lenity to the Sentencing Guidelines), *cert. denied*, 516 U.S. 1016 (1995). "The rule of lenity, however, applies only in cases where there is a grievous ambiguity or uncertainty in the language and structure of a provision." *United States v. Onheiber*, 173 F.3d 1254, 1256 (10th Cir. 1999) (quotation marks and citations omitted). The rule of lenity "is a rule of last resort [and] the mere assertion of an alternative interpretation is not sufficient to bring the rule into play." *Blake*, 59 F.3d at 140.

After a thorough review of the text and structure of the career offender guideline, and mindful of the lawmaker's manifest intent, we do not believe the § 4B1.1 offense level and criminal history category language is grievously ambiguous or uncertain. *See United States v. Schneider*, 14 F.3d 876, 879 (3d Cir. 1994). For the reasons stated, the provision unequivocally addresses the applicable offense level and the automatic criminal history category that shall apply in "every case." *See* U.S.S.G. § 4B1.1. Moreover, Congress intended the

career offender provision to impose substantial imprisonment at or near the statutory maximum for repeat drug traffickers and repeat violent offenders. *See* U.S.S.G. § 4B1.1 comment. (backg'd). In order to accept Mr. Gay's argument, we would ignore the plain language requiring a criminal history category VI in "every case" and nullify Congress' evident intent. We refuse to do so. Accordingly, we conclude no grievous ambiguity exists and Mr. Gay's assertion of an alternative interpretation is simply insufficient to invoke this rule. *See Blake*, 59 F.3d at 140.

Finally, Mr. Gay argues the district court erred in computing his criminal history category by improperly including deferred sentences in computing his criminal history. We need not pause long to consider Mr. Gay's contention because we concluded a criminal history category VI applies in his case pursuant to § 4B1.1. Thus, our holding renders Mr. Gay's argument moot. We **AFFIRM** the judgment of the United States District Court for the Western District of Oklahoma.