NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0478n.06

Case No. 22-3087

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Nov 28, 2022
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
|  | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE UNITED |
|  | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE NORTHERN DISTRICT OF |
|  | ) | OHIO |
| LAWRENCE DUNBAR, | ) | |
|  | ) | |
| Defendant-Appellant. | ) | OPINION |
|  | ) | |

Before: SUTTON, Chief Judge; GRIFFIN and NALBANDIAN, Circuit Judges.

SUTTON, Chief Judge. Lawrence Dunbar, an Ohio parolee, failed to follow the rules of supervised release and, after that, allegedly committed an assault. When parole officers arrested Dunbar, they uncovered narcotics and a firearm in his apartment. A jury convicted Dunbar on weapons and drug-distribution charges. He now challenges the denial of his suppression motion and several features of his conviction. We affirm.

I.

As a parolee, Dunbar agreed to various parole conditions. He violated those conditions twice over by fleeing in July 2018 and allegedly shooting at someone in February 2019. After two arrest warrants issued, the Ohio Adult Parole Authority's fugitive task force sought to arrest Dunbar. Over several months, a confidential source and "investigational measures" led the task force to an apartment building at 2249 Elm Street. R.100 at 28. The officers spoke with the

building's managers and showed them a picture of Dunbar. The managers confirmed that Dunbar lived in unit 318 and gave the officers a key to the unit.

Armed with this information, the task force watched unit 318 from 7:15 am to 9:30 am but did not see Dunbar. The officers then knocked and announced themselves several times. They heard a noise inside, like a rustle or a cough, but no one answered the door. The officers opened the door with the key and entered the apartment. Moving through the unit, they told Dunbar to exit. Dunbar eventually "made verbal contact" and came out of the master bedroom and into the hallway. R.100 at 50. The officers took him into custody and cleared the rooms adjoining the hallway: the master bedroom, second bedroom, and bathroom. The officers didn't find any other people, but they did find suspected drug paraphernalia (baggies) sitting on the nightstand in the master bedroom.

The officers determined that the drug paraphernalia could violate the terms of Dunbar's parole and decided to conduct a warrantless parolee search, all consistent with the terms of his supervised release. Shortly into the search, they found suspected heroin and a handgun in the living room under the couch. At that point, the officers paused the search and obtained a search warrant, because the drugs fell "more outside of the scope of [the] Adult Parole Authority to seize." R.47 at 17. Continuing the search under the warrant, the officers found more drugs and drug paraphernalia. And they found signs of a single resident: clothing and shoes of a similar size and style, one toothbrush, one set of car keys, one bed, and receipts listing Dunbar's name.

A grand jury charged Dunbar with possessing a firearm and ammunition as a felon; possessing carfentanyl, cocaine, and heroin with the intent to distribute; and possessing a firearm in furtherance of a drug trafficking crime. Dunbar filed a motion to suppress the evidence found at his apartment, which the district court denied. The jury convicted Dunbar on all charges, save

2

for possessing a firearm in furtherance of a drug trafficking crime. The district court imposed a 245-month sentence. Dunbar appeals.

## II.

Dunbar challenges the denial of his suppression motion, the sufficiency of the evidence that he possessed the gun and narcotics, the admission of alleged hearsay statements, and the effectiveness of his trial counsel.

The suppression motion implicates three Fourth Amendment questions: Did the officers permissibly enter unit 318? Did they perform a valid protective sweep? And did they conduct a reasonable warrantless parolee search?

*Entry into the apartment.* The Fourth Amendment prohibits "unreasonable searches and seizures" of "persons, houses, papers, and effects." Homes in particular receive robust Fourth Amendment protection. *Payton v. New York*, 445 U.S. 573, 589–90 (1980). When arresting a suspect at home, officers customarily need to obtain an arrest warrant first. *Id.* at 590, 603. The warrant imbues officers with "the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Id.* at 603. In this case, put in other words, the officers needed a "reasonable belief" based on "common sense factors" and "the totality of the circumstances" that (1) Dunbar lived in unit 318 and (2) they would find Dunbar inside. *See El Bey v. Roop*, 530 F.3d 407, 416 (6th Cir. 2008) (quotation omitted). (Our court has not resolved whether "reasonable belief" amounts to probable cause or something less. *See United States v. Baker*, 976 F.3d 636, 642 (6th Cir. 2020). But we need not resolve the point today because both standards are met.)

Start with whether the officers had probable cause to believe that Dunbar lived in unit 318. An officer testified that "confidential source information" and "investigational measures" led the

task force to 2249 Elm Street. R.100 at 28. After seeing a picture of Dunbar, the apartment managers confirmed that he resided in unit 318 and handed over a key to the unit. That created a fair probability Dunbar lived there.

The officers also had probable cause to believe that they would find Dunbar inside. The officers surveilled the unit from 7:15 am to 9:30 am and saw no one come or go. The officers could reasonably expect Dunbar would be home during those early hours. *See United States v. Thomas*, 429 F.3d 282, 286 (D.C. Cir. 2005); *United States v. Terry*, 702 F.2d 299, 319 (2d Cir. 1983); *see also Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 689 (6th Cir. 2006). Dunbar's fugitive status increased the probability of finding him at home at this time. *El Bey*, 530 F.3d at 418; *see also Valdez v. McPheters*, 172 F.3d 1220, 1226 (10th Cir. 1999). And, perhaps most importantly, the officers learned more when they knocked and announced their presence. *See El Bey*, 530 F.3d at 418. They heard a cough or a rustle, indicating that someone was inside the apartment. *See United States v. Gay*, 240 F.3d 1222, 1227–28 (10th Cir. 2001). But no one answered the door, consistent with Dunbar's fugitive status. When combined with the time of day, the two-hour surveillance period, and the manager's confirmation that Dunbar lived in the unit, the officers had a fair probability of finding Dunbar inside.

Dunbar raises several counterarguments. Turning first to Supreme Court precedent, Dunbar argues that *Steagald v. United States*, 451 U.S. 204 (1981), requires officers to obtain a search warrant to make an arrest in a home, even if they have an arrest warrant. Dunbar is mistaken. In *Steagald*, police entered Gary Steagald's home to execute an arrest warrant for Ricky Lyons, a third party. *Id.* at 206, 212. The Court held that the third-party arrest warrant did not adequately protect the homeowner. *Id.* at 212–14. It "carefully circumscribed" its analysis to that situation. *United States v. Pruitt*, 458 F.3d 477, 481 (6th Cir. 2006). Here, by contrast, the officers

4

had a warrant for Dunbar's arrest, and they entered Dunbar's home. Dunbar's case is not Steagald's case. *See El Bey*, 530 F.3d at 415.

Pivoting to this court's precedent, Dunbar argues that the officers did not have any reason to believe they would find him at home. *See United States v. Hardin*, 539 F.3d 404 (6th Cir. 2008); *United States v. Jones*, 641 F.2d 425 (6th Cir. 1981), *overruled by Steagald*, 451 U.S. at 216. Both cases are inapt. In *Hardin*, the officers relied on a confidential informant's tip that Malik Hardin might be in an unidentified apartment. *Hardin*, 539 F.3d at 423. But the informant did not say when he had last seen Hardin, nor had the apartment manager ever seen him. *Id.* We concluded that the officers had "essentially *no* evidence to indicate that Hardin was *then* inside the apartment." *Id.* at 423–24. But today's officers received confirmation from the managers that Dunbar lived in unit 318, watched the unit for two hours in the early morning, and heard a noise inside after they knocked and announced, all indicating that Dunbar was likely inside. *Jones* held that the officers did not have reason to believe that they would find a suspect named in an arrest warrant in his brother's girlfriend's home. *Jones*, 641 F.2d at 428–29. But *Jones* did not survive *Steagald*. *Hardin*, 539 F.3d at 412. And even if it did, *Jones* considered the execution of a third-party warrant, not the first-party warrant involved in this case.

Changing tack, Dunbar objects that the apartment managers did not testify at the suppression hearing. But this objection overlooks the reality that the Evidence Rules do not apply at suppression hearings. Fed. R. Evid. 104(a); *United States v. Matlock*, 415 U.S. 164, 172–74 (1974). Hence the district court could consider the managers' out-of-court statements. *See Matlock*, 415 U.S. at 172–74.

Dunbar points out that he did not sign the lease for unit 318; "Justin Cooper" did. But an officer ran the Social Security and Ohio driver's license numbers listed for Cooper on the lease.

The Social Security number belonged to someone who died in 1986. And the driver's license did not match the format of an Ohio ID and returned no results. The officer reasonably concluded that Cooper did not exist.

*Protective sweep.* Dunbar separately challenges the protective sweep. Recall that after taking Dunbar into custody in the hallway, the officers cleared the remainder of the apartment— the bathroom and two bedrooms—and noticed drug paraphernalia in plain view in the master bedroom. When conducting an arrest, officers may "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched," even without reasonable suspicion. *Maryland v. Buie*, 494 U.S. 325, 334 (1990). But to sweep beyond those immediately adjoining areas, officers must have a reasonable belief of finding a dangerous individual. *Id.* The officers arrested Dunbar in the hallway after he emerged from the master bedroom. The two bedrooms and bathroom "immediately adjoin[ed] the place of arrest," *id.*, permitting the officers to sweep them without reasonable suspicion of finding another dangerous person, *see Thomas*, 429 F.3d at 287–88.

Dunbar objects to the sweep's intrusiveness, noting that officers "searched the entire apartment, including drawers." Appellant's Br. 25. But in doing so he overlooks the sequence of events. Officers quickly cleared the adjoining rooms, during which they saw drug paraphernalia in plain view. After the protective sweep concluded, the officers conducted a warrantless parolee search. Only at that point did they conduct a thorough search of the entire apartment.

*Parolee search.* Dunbar also challenges the warrantless parolee search. Two potential frameworks apply, but the government just needs to satisfy one. *United States v. Sharp*, 40 F.4th 749, 752–53 (6th Cir. 2022). Under *Griffin*, courts uphold warrantless parolee searches when (1) a constitutional state law authorized the search, and (2) the search complied with that law. *Griffin*

*v. Wisconsin*, 483 U.S. 868, 880 (1987) (search of probationer); *Sharp*, 40 F.4th at 757–58 (applying *Griffin* to parolee). And *Knights-Samson* tells courts to evaluate the reasonableness of a warrantless search conducted under a condition of supervision through a "totality of the circumstances" approach. *Samson v. California*, 547 U.S. 843, 848 (2006); *United States v. Knights*, 534 U.S. 112, 118 (2001). Relevant factors under the *Knights-Samson* approach include the suspect's post-supervision status, terms of the search condition, and the State's interest in post-release supervision. *Sharp*, 40 F.4th at 753.

The search checked *Griffin*'s boxes. To start, Ohio Rev. Code Ann. § 2967.131(C) authorized it. The statute allows officers to search a parolee's residence without a warrant when they "have reasonable grounds to believe that the individual . . . is not abiding by the law, or otherwise is not complying with the [parole] terms and conditions." *Id.* We have already held that § 2967.131(C) "passes constitutional muster." *United States v. Loney*, 331 F.3d 516, 521 (6th Cir. 2003). And the officers followed the statute's dictates. Dunbar had refused to abide by the terms of supervised release and allegedly committed an assault, giving the officers reason to believe he violated his parole conditions and the law. So too for the drug paraphernalia in plain view, which separately provided reason to believe that Dunbar broke the law.

*Sufficiency of the evidence.* Turning to the jury trial, Dunbar challenges the sufficiency of the evidence proving he possessed the firearm and drugs. To resolve this challenge, we construe all evidence in favor of the verdict and determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

The felon-in-possession and drug-distribution charges required the government to prove that Dunbar possessed the gun and drugs. *See* 18 U.S.C. § 922(g)(1); 21 U.S.C. § 841(a)(1).

Dunbar was not actually holding any contraband when he was arrested, to be sure. But constructive possession—that Dunbar "knowingly [had] power and intention to exercise control over an object"—suffices. *United States v. Critton*, 43 F.3d 1089, 1096 (6th Cir. 1995); *see United States v. Arnold*, 486 F.3d 177, 183–84 (6th Cir. 2007) (en banc). And proof that Dunbar "[had] dominion over the premises" containing the contraband, in turn, can establish constructive possession. *United States v. Clemis*, 11 F.3d 597, 601 (6th Cir. 1993) (per curiam).

Consider what the jury learned at trial. They heard that officers catalogued one bed, one toothbrush, clothing and shoes in a similar style and size, and one car key that opened a car parked in the complex's parking garage—all of which supports the inference that just one person lived in unit 318. The jurors learned that Dunbar likely had been inside the unit from at least 7:15 am, when surveillance began, until his arrest at 9:30 am. They saw receipts dated a couple of weeks before the arrest from a nearby store that listed Dunbar's name. And they heard a jail call in which Dunbar referred to the apartment as "my spot." R.86 ¶ 13. From this evidence, the jury could reasonably infer that Dunbar was the apartment's sole resident. The government, in brief, introduced sufficient evidence of constructive possession.

Dunbar responds that mere proximity to or knowledge of contraband does not establish constructive possession, invoking *United States v. Pena*, 983 F.2d 71 (6th Cir. 1993), and *United States v. Smith*, 20 F. App'x 258 (6th Cir. 2001). In *Pena* and *Smith*, it's true, we held that passengers in vehicles with narcotics did not possess that contraband. But unlike the passengers in *Pena* and *Smith*, who lacked knowledge of the contraband or control over the vehicle, a jury could reasonably find based on the circumstantial evidence here that Dunbar controlled the apartment. That "tip[s] the scale in favor of sufficiency." *United States v. Birmley*, 529 F.2d 103, 108 (6th Cir. 1976); *see Arnold*, 486 F.3d at 183–84.

Dunbar presses back, posing three questions about the evidence. What of the lack of direct evidence, like fingerprints or DNA, tying him to the drugs? Circumstantial evidence suffices. *Arnold*, 486 F.3d at 181. What of the lack of fingerprints on the gun? The jury could credit the fingerprint analyst's testimony that guns routinely lack fingerprints because of how they are held and how they produce heat upon firing. And, again, circumstantial evidence tied Dunbar to the apartment and gun. *See Clemis*, 11 F.3d at 601. What of Justin Cooper's signature on the lease? An officer credibly testified that Cooper did not exist. The jury could reasonably infer that Dunbar used this persona because of his fugitive status. Despite Dunbar's objections, the reality that the jury had to draw inferences to convict him does not provide a reason to overturn the verdict. *See Arnold*, 486 F.3d at 182.

*Confrontation Clause.* Dunbar argues that the district court admitted four hearsay statements in violation of the Confrontation Clause of the Sixth Amendment. It affords the accused the right "to be confronted with the witnesses against him." And it forbids the admission of testimonial hearsay statements against a criminal defendant unless that defendant had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004).

Before turning to the statements, a brief interlude is in order about the standard of review. Dunbar objected to only one of the four statements at trial. We review the objected-to statement for harmless error, affirming if we have "a fair assurance that the outcome of the trial was not affected by evidentiary error." *United States v. Warman*, 578 F.3d 320, 345 (6th Cir. 2009) (quotation omitted). In contrast, we review the other three statements for plain error. *See id.* Dunbar must show an obvious error that affected both his substantial rights and the "fairness, integrity, or public reputation of the judicial proceedings." *Id.* (quotation omitted).

Start with the single statement to which Dunbar objected at trial. When walking through the events that occurred on the morning of Dunbar's arrest, Officer Brian Ortiz testified that "[w]e were informed by management staff that Mr. Dunbar was currently residing I believe it was Apartment 318." R.100 at 29. The government offered this testimony to explain why the task force officers surveilled unit 318, had a key, and knocked and announced at that unit. In other words, the government offered the testimony for its effect on the listener (to explain why the officers took certain actions on the day of the arrest) and not the truth of the matter asserted (to show that Dunbar lived in unit 318). *See United States v. Churn*, 800 F.3d 768, 776 (6th Cir. 2015) (statement offered for effect on listener is not hearsay); *United States v. Gibbs*, 506 F.3d 479, 486 (6th Cir. 2007) (similar). It follows that Officer Ortiz's testimony did not implicate the Confrontation Clause. *See Crawford*, 541 U.S. at 59 n.9.

Now consider the statements that did not receive an objection at trial. Deputy Marshal Josh Lowe, to start, testified that "I told [the managers] that we had credible information that we thought he was staying somewhere in the building and just were looking to see if they had a specific apartment that they recognized him to be associated with." R.101 at 51. Like the prior statement, this testimony provided background information as to why the officers turned up at 2249 Elm Street in the first place. It is not hearsay. *See Gibbs*, 506 F.3d at 486.

So too for the next challenged statement. When asked at trial why the police did not test the drugs or gun for DNA, Sergeant Jeffrey Holdeman replied: "Because the only occupant at the time of our presence, and as confirmed from outside sources and briefed, was present with all of the stuff that we seized." R.101 at 117. This statement addresses "why the officers took the actions they did" in deciding not to conduct DNA testing. *United States v. Cromer*, 389 F.3d 662, 676 (6th Cir. 2004).

10

The final challenged statement conveys a different story. When asked during cross-examination if video footage showed Dunbar regularly using unit 318, Officer Ortiz replied that "[m]anagement instructed me that Mr. Dunbar was using 318." R.101 at 43. This unresponsive statement came on the heels of several admissions. Among other things, Officer Ortiz admitted that he did not know how many times Dunbar slept in unit 318, how many other people used the apartment, if Dunbar had carried the drugs into the unit, if Dunbar's ID listed unit 318 as his address, and if the utility bill listed Dunbar's name. This statement—coming after this series of admissions and in response to a question about video footage—could be construed as speaking to the truth of where Dunbar resided. But we need not delve into the issue further. Whether or not the statement violated the Confrontation Clause, Dunbar cannot surmount the plain-error hurdle. Other evidence showed that Dunbar lived in unit 318, including his early-morning presence in the unit, receipts with his name on them, and the jail call. This body of evidence "makes it unlikely that the challenged statement[] affected either [Dunbar's] substantial rights or the fairness of the judicial proceedings." *Warman*, 578 F.3d at 347.

Dunbar's final objection, that the government used the statements during closing to prove possession, lacks merit. Although the government mentioned Sergeant Holdeman's testimony, it did not discuss his "outside sources." R.101 at 117. And the government did not discuss the other challenged statements.

*Ineffective assistance.* Dunbar claims that his trial counsel was ineffective for failing to request a corrective or limiting jury instruction for the four challenged statements. But in line with "our custom," we decline to review Dunbar's ineffective assistance claim on direct appeal. *United States v. Tisdale*, 980 F.3d 1089, 1098 (6th Cir. 2020).

We affirm.

11