**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 24, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

ANTONIO DJUAN THOMPSON,

      Defendant-Appellant.

No. 09-6181
(D.C. No. 5:08-CR-00166-D-1)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **GORSUCH, EBEL**, Circuit Judges, and **ARGUELLO**,[**] District Judge.
_____

On April 4, 2008, officers from the Oklahoma City Police Department entered the

home of Letitia Harris to execute an arrest warrant on Defendant-Appellant Antonio

Djuan Thompson for a charge unrelated to this case. There they found not only

Thompson, but also, a gun, ammunition, and marijuana.

_____

   [*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. This court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 32.1

   [**] Honorable Christine M. Arguello, District Court Judge, District of Colorado,
sitting by designation.

That evidence formed the basis for the indictment in this case. Thompson was charged with possession of a firearm and ammunition after conviction of a felony (count I) and possession of marijuana (count II). 18 U.S.C. § 922(g)(1); 21 U.S.C. § 844(a). He was convicted after a bench trial and sentenced to 235 months' imprisonment.

On appeal, Thompson challenges the district court's denial of his motion to suppress. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

**BACKGROUND**

The following facts are taken from the district court's findings, as gleaned from evidence submitted during the suppression hearing. Given the posture, we view these facts in light most favorable to the government. *United States v. Colonna*, 360 F.3d 1169, 1173 (10th Cir. 2004).

During the relevant period, February to April 2008, Sgt. Kenneth Rambo was the Intelligence Led Policing (ILP) Officer with the Oklahoma City Police Department. In that position, he was responsible for conveying information to patrol officers regarding suspects. On February 14, 2008, he wrote an email in which he notified officers that Thompson was one of three suspects in an ongoing robbery investigation. Thompson was identified by name and birth date, and was said to be a member of the Neighborhood Nineties street gang. The email also stated that Thompson was "possibly staying with his girlfriend (Letitia Harris) at 4619 Creek Court."

Sgt. Matthew McRorie was one of the officers who read this email. Upon reading it, Sgt. McRorie tried to locate Thompson. He followed his usual practice of reviewing police department files and printing off a record of Thompson's known addresses, employers, and known associates. This revealed that Thompson listed his home address as 2213 N. Kelham Avenue. Sgt. McRorie, however, doubted Thompson actually lived there. In his experience as a gang unit officer, during police contacts gang members often provide a relative's address rather than their true residence addresses. Sgt. McRorie was familiar with Thompson and Thompson's relatives because of their prior arrests. He knew Thompson was a member of the Neighborhood Nineties street gang. He was also familiar with the Kelham address – he believed it was the residence of one of Thompson's relatives. He believed this because relatives of Thompson had also listed that address as theirs and, moreover, he had never seen Thompson at that address. After receiving the February email, Sgt. McRorie drove by the Kelham address several times, but did not see Thompson.

On April 3, 2008, an Oklahoma state judge issued an arrest warrant for Thompson. The warrant listed 2213 N. Kelham Avenue as Thompson's address.

The same day the warrant was issued, Sgt. McRorie again attempted to locate Thompson. He talked with several known associates of Thompson. He asked them if they knew Thompson and where he could be found. At least two of these associates told Sgt. McRorie that Thompson was living with his girlfriend. They also told Sgt. McRorie they had seen Thompson in a vehicle described as a green Escalade or Tahoe. Sgt.

3

McRorie did not recall the names of these associates. Nevertheless, he considered the information reliable because it was separately provided by more than one person on the same day. He also reviewed a January 2008 arrest record in which Thompson was arrested for driving with a suspended license; the record reflected that Thompson contacted his girlfriend, Letitia Harris, to pick up his car so it would not be impounded. Finally, he checked public records regarding utilities in an attempt to verify Ms. Harris's address. The records showed that Ms. Harris resided at 4619 Creek Court in Oklahoma City.

During the night of April 3 and into the early morning hours of April 4, Sgt. McRorie drove by the Creek Court residence several times. Each time, he saw a green Escalade parked at the residence. The Escalade bore a paper tag with the name "Harris."

Sgt. McRorie did not attempt to execute the arrest warrant. He knew Thompson was accused of a violent crime; thus, he wanted backup officers to help, which he could not secure at the time.

Instead, Sgt. McRorie reported to Sgt. Rambo and Sgt. David Roberts what he knew. He told them what Thompson's associates had told him – that Thompson was driving a green Escalade or Tahoe and that Thompson was staying with his girlfriend. He told them he had identified Letitia Harris as Thompson's girlfriend, and that he verified her address as 4619 Creek Court. Finally, Sgt. McRorie told Sgt. Rambo and Sgt. Roberts that he had driven by the Creek Court address several times throughout his shift

4

on April 3 and the morning of April 4; each time he had observed a green Escalade parked there.

Sgt. Rambo had already conducted his own investigation regarding Thompson. Like Sgt. McRorie, he had checked the police records and learned that, when arrested in January of 2008, Thompson had contacted his girlfriend, Letitia Harris, to pick up his vehicle. He also checked other records and confirmed that Letitia Harris resided at 4619 Creek Court.

Based on the information provided by Sgt. McRorie and the information he had previously obtained, Sgt. Rambo proceeded to 4619 Creek Court to arrest Thompson. He was accompanied by Sgt. Roberts and three other officers. They arrived at approximately 7:30 a.m. Upon arrival, he saw a green Escalade parked at the residence.

Three officers went to the rear entrance and sides of the residence, while Sgt. Roberts and Sgt. Rambo approached the door. Sgt. Roberts knocked on the door. He heard a female voice ask who it was. He announced it was the police. A black female opened the door. Sgt. Roberts told her they were there to arrest Thompson and asked if Thompson was there. According to Sgt. Roberts, the female said "um," and motioned with her head over her right shoulder. He interpreted her response as indicating that Thompson was inside and behind her. The officers entered the home, heading in the direction in which the young woman motioned. That led them to a bedroom, where they found Thompson naked and asleep in bed. Inside the room, officers found the loaded firearm and marijuana.

5

Three months later, Thompson was indicted.  On September 24, 2008, Thompson filed a motion to suppress the evidence seized in the house.  The district court held an evidentiary hearing on October 8, 2008 and, two days later, issued an order denying Thompson's motion to suppress.  Thompson was later tried, convicted, and sentenced to 235 months' incarceration.  Thompson now challenges the district court's denial of his motion to suppress.

## STANDARD OF REVIEW

When reviewing the denial of a motion to suppress, we consider the totality of the circumstances and view the evidence in the light most favorable to the government. *United States v. Gay*, 240 F.3d 1222, 1225 (10th Cir. 2001).  "We accept the district court's factual findings unless clearly erroneous" and review its ultimate determination of reasonableness under the Fourth Amendment *de novo*.  *Id*.

## DISCUSSION

The Fourth Amendment provides:

> The right of the people to be secure in their . . . houses . . . , against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV.

Inherent in this refrain is a tension often identified by the Supreme Court – society's interest in preserving the sanctity and privacy of one's home versus its interest in effective law enforcement.  *See generally Coolidge v. New Hampshire*, 403 U.S. 443

6

(1971); *Johnson v. United States*, 333 U.S. 10 (1948).  It has also long acknowledged the key to balancing those interests – the requirement that a neutral magistrate, as opposed to the police, determine whether probable cause exists for the search or seizure.  As stated by Justice Jackson on behalf of the Court in *Johnson v. United States*:

> Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing.  The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance.  When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.

333 U.S. 10, 14 (1948).

In light of these considerations, the Supreme Court, in two cases decided a year apart, laid out the rules law enforcement must observe in making arrests in a home. *Steagald v. United States*, 451 U.S. 204 (1981); *Payton v. New York*, 445 U.S. 573 (1980).  In *Payton*, the Court acknowledged that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."  *Payton*, 445 U.S. at 585 (quoting *United States v. United States District Court*, 407 U.S. 297, 313 (1972)).  It further observed that "[i]t is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 586 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 477 (1971)).  The Court concluded, however, that, despite the Constitution's special regard for the home, "an arrest warrant founded on probable cause implicitly carries with it the limited authority to

7

enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Id*. at 603. In light of *Payton*, this court has created a two-prong test for determining whether an arrest warrant alone is sufficient to justify entrance into a home. For their entrance to be lawful, officers must have a reasonable belief the arrestee (1) lives in the residence and (2) is within the residence at the time of entry. *United States v. Gay*, 240 F.3d 1222, 1226 (10th Cir. 2001) (citing *Valdez v. McPheters*, 172 F.3d 1220, 1224-25 (10th Cir. 1999)).

Thompson maintains, however, that *Steagald*, not *Payton*, is controlling. The *Steagald* Court reaffirmed the validity of *Payton* – that an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within. *Steagald*, 451 U.S. at 214 n.7. It explained that "[b]ecause an arrest warrant authorizes the police to deprive a person of his liberty, it necessarily also authorizes a limited invasion of that person's privacy interest when it is necessary to arrest him in his home." *Id*. The Court added, however, that "[t]his analysis . . . is plainly inapplicable when the police seek to use an arrest warrant as legal authority to enter the home of a third party to conduct a search." *Id*. Absent exigent circumstances or consent, the police cannot lawfully search for the subject of an arrest warrant in the home of a third party without first obtaining a search warrant. *Id*. at 205-206.

Whether *Steagald* (third-party's home) or *Payton* (suspect's home) applies is resolved under the first prong of the *Payton* test. *Gay*, 240 F.3d at 1226. If the officers

8

reasonably believe the suspect lives at the residence, then *Payton* applies. The officers

may enter on the authority of the arrest warrant, provided they reasonably believe the

suspect is inside. They do not need a search warrant. If, however, the officers' belief that

the suspect lives at the residence is not reasonable, then this implies the residence is a

third-party residence. In that case, *Steagald* applies, i.e., the officers' arrest warrant is

insufficient – they need a search warrant to enter.

## I.      Whether The Officers Had A Reasonable Belief That Thompson Lived In The Residence

The first prong of the *Payton* test requires that officers have a reasonable belief the

suspect lives in the residence. *Gay*, 240 F.3d at 1226. Determining where someone lives,

however, is not always a straightforward endeavor. "[P]eople do not live in individual,

separate, hermetically sealed residences." *Valdez*, 172 F.3d at 1225. Rather, they live

with other people and often move from one residence to another. *Id*. Accordingly, "[t]he

officers' belief need not prove true in fact, it is sufficient if the belief was objectively

reasonable at the time of entry." *Id*. Moreover, "*Payton* and *Steagald* cannot be

understood to divide the world into residences belonging solely to the suspect on the one

hand, and third parties on the other." *Id*. Thus, if the officers reasonably believe the

suspect possesses common authority over, or some other significant relationship to, the

residence, then this prong is satisfied. *See id.; Gay*, 240 F.3d at 1226.

Thompson argues the officers' information was insufficient to create a reasonable belief he lived at 4619 Creek Court; thus, he concludes the district court erred in denying his motion to suppress. We disagree.

The information on which the officers relied in forming their belief that Thompson lived at 4619 Creek Court – while perhaps insufficient to *prove* Thompson lived there – was sufficient to support a reasonable belief that he did. As detailed above, prior to the execution of the warrant, Sgt. McRorie had information that Thompson was driving a green Tahoe or Escalade, that he was staying with Letitia Harris, that Ms. Harris lived at 4619 Creek Court, and that the green Escalade was at that residence the night and morning of April 3-4, 2008. Sgt. McRorie relayed all of this information to Sgt. Rambo, who had also conducted an investigation, the results of which were consistent with McRorie's investigation.

Thompson attempts to cast doubt on the officers' beliefs by pointing to evidence suggesting that he lived not at 4619 Creek Court, but rather, at 2213 N. Kelham Avenue. Sgt. Rambo, for example, testified at the suppression hearing that, in February 2008, he thought Thompson's address was 2213 N. Kelham. He also testified that, from February 14, 2008 to April 3, 2008, he never went by the 4619 Creek Court address. Instead, when looking for Thompson he would go by the 2213 N. Kelham address. Asked why he went to 2213 N. Kelham instead of 4619 Creek Court, Rambo explained that Thompson's address was 2213 N. Kelham, thus, that was the first logical place to look.

10

As to Sgt. McRorie, he was also familiar with the 2213 N. Kelham address. When he pulled Thompson's arrest records, the most recent one, dated January 2008, listed Thompson's address as 2213 N. Kelham. So did the arrest warrant, issued the day before Thompson's arrest.

We acknowledge this information may have suggested to the officers that Thompson lived at 2213 N. Kelham Avenue. This suggests, in turn, one problem presented by the *Payton*/*Steagald* analysis – what if the suspect lives at more than one residence? The facts of this case also suggest another problem with the *Payton*/*Steagald* analysis – what if the suspect shares a residence with others not named in the arrest warrant?

## A.    What If The Suspect Lives In More Than One Residence?

The *Payton*/*Steagald* distinction does not lend itself to resolving the situation where a suspect lives in more than one dwelling. Here, for example, the officers had information suggesting that, on the one hand, Thompson lived at 2213 N. Kelham and, on the other, that he lived at 4619 Creek Court. Can officers reasonably believe that a suspect lives at two or more places? The language in *Payton* suggests the answer is yes. Justice Stevens, writing on behalf of the Court, stated that, "an arrest warrant founded on probable cause carries with it the limited authority to enter *a dwelling* in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603 (1980) (emphasis added). The use of the indefinite article "a" before "dwelling" suggests the "dwelling" need not be a specific dwelling. *See* BRYAN A.

11

GARNER, *GARNER'S MODERN AMERICAN USAGE* (3rd ed. 2009) ("Each of these [indefinite articles] points to a non-specific object, thing, or person that is not distinguished from the other members of a class.") The members of this class – as suggested by the language in *Payton* – would be the various dwellings in which the suspect lives. Had the Court contemplated a particular dwelling, that is, had the Court limited the reach of its rule to one dwelling per suspect, then it would have used the definite article "the," which refers to a particular thing, in this case, a particular dwelling. *See id.* Given the Court's choice of the indefinite article in writing "a dwelling," the Court must have contemplated that a suspect can live in more than one dwelling. *See also, e.g., United States v. Risse*, 83 F.3d 212, 217 (8th Cir. 1996) ("We have found no authority to support [the defendant's] implicit assumption that a person can have only one residence for Fourth Amendment purposes.").

We conclude, then, that *Payton* does not void as "unreasonable"[1] an officer's belief that a suspect lives in a given dwelling merely because that suspect also "lives" in another. Here, although police may have reasonably believed Thompson lived at 2213 N. Kelham, it was also reasonable for them to believe he lived at 4619 Creek Court. This point is underscored by this court's gloss on *Payton*. In *Valdez v. McPheters*, we stated that "[t]he rule announced in *Payton* is applicable so long as the suspect 'possesses common authority over, or some other significant relationship to,' the residence entered

---

[1] "Unreasonable" means "Not guided by reason; irrational or capricious." BLACK'S LAW DICTIONARY (9th ed. 2009).

by police." *Valdez v. McPheters*, 172 F.3d 1220, 1225 (10th Cir. 1999) (quoting *United States v. Risse*, 83 F.3d 212, 217 (8th Cir. 1996)).  We acknowledge the term "significant relationship" lacks ideal utility.  At what point, for example, does a suspect's relationship with a residence become "significant" such that he or she can be said to be living there?  This question could flummox law enforcement.  We trust, however, that law enforcement will take the plain meaning of the word "significant" – important, notable[2] – and not abuse this admittedly permissive standard.  Whether they do so, unfortunately, we must address on a case-by-case basis.  In any event, given the totality of the information the officers had in this case, we find that the officers reasonably believed Thompson had a "significant relationship" with the 4619 Creek Court address.  Accordingly, under this analysis the officers did not require a search warrant to enter that residence.

**B.      What If The Suspect Shares A Residence With A Third Party?**

There is, however, another problem.  The officers in this case had reason to believe that more than one person lived at 4619 Creek Court.  Indeed, the parties agree that Letitia Harris lived there.  She is, however, a third party, i.e., she was not named in the arrest warrant.  Her residence, then, is a third-party residence.  This, in turn, suggests *Steagald* is controlling, i.e., that the officers needed a search warrant to enter her residence to search for Thompson.  Such a conclusion would be consistent with the Court's rationale in *Steagald*.  In finding that, absent exigent circumstances or consent, a search warrant is required to search the home of a third party for the subject of an arrest

_____

[2] OXFORD ENGLISH DICTIONARY ONLINE (from the 2d print ed. 1989).

warrant, the *Steagald* Court distinguished between the privacy interests of a suspect versus those of a third party. *Steagald*, 451 U.S. at 212-213. An arrest warrant protects the privacy interests of the person named in the warrant from an unreasonable seizure; it does not, however, protect the privacy interests of third parties such as Ms. Harris. *Id*. at 213. Thus, the privacy interests of third parties are violated when police officers invade their homes to search for the subject of an arrest warrant. *See id*. To protect third parties' privacy interests against unreasonable searches of their homes, a search warrant is required. *Id*. at 214 n.7. That is, the Constitution requires that police officers first obtain a search warrant naming their home as the place to be searched, and the subject of the arrest warrant as the "object" of the search. *Id*. Thus, in this circumstance, police officers must make two separate showings of probable cause: (1) for the arrest warrant, probable cause that the suspect committed a crime; and (2) for the search warrant, probable cause that the suspect can be found at the third-party's home. This analysis, however, suggests that residences can be neatly divided into those that are third-party residences and those that are suspects' residences. As mentioned, that is rarely the case. *Valdez v. McPheters*, 172 F.3d 1220, 1225 (10th Cir. 1999) ("*Payton* and *Steagald* cannot be understood to divide the world into residences belonging solely to the suspect on the one hand, and third parties on the other."). Here, not only was it reasonable for the officers to believe Ms. Harris lived at 4619 Creek Court, it was also reasonable – albeit perhaps not *as* reasonable – for the officers to believe that Thompson lived at 4619 Creek Court. Thus, 4619 Creek Court was not only a third-party residence. In the officers' eyes it was a

14

shared residence. Given the totality of the information, it was reasonable for the officers to believe the residence was shared by Thompson (the suspect) and Ms. Harris (a third party). Thus, on these facts, *Payton* not *Steagald* applies. *See, e.g., United States v. Litteral*, 910 F.2d 547, 553 (9th Cir. 1990) ("if the suspect is a co-resident of the third party, then *Steagald* does not apply[.]").

We now consider the second prong of the *Payton* analysis – whether the officers reasonably believed Thompson was inside the residence at the time of entry.

## II. Whether The Officers Had A Reasonable Belief Thompson Was Within The Residence At The Time Of Entry

In deciding this prong, we must be sensitive to common sense factors indicating a resident's presence. *Valdez*, 172 F.3d at 1226. The officers, for example, are not required to actually view the suspect on the premises. *Id.* Indeed, the officers may take into account the fact that the person allegedly involved in criminal activity may be attempting to conceal his whereabouts. *Id.* Factors suggesting the suspect's presence include the presence of the suspect's automobile and the absence of evidence the suspect is elsewhere. *Id.*

Given the information the officers had, we conclude they had a reasonable belief Thompson was within the residence at the time of entry. The officers had information that Thompson was staying with Letitia Harris. They confirmed Ms. Harris lived at 4619 Creek Court. They had information that Thompson was driving a green SUV. During the night of April 3-4, 2008, one of them observed, multiple times, a green Escalade at 4619

15

Creek Court. When officers arrived at 4619 Creek Court the next morning to execute the warrant, they saw the green Escalade. Based on these facts, it was reasonable for the officers to infer that Thompson was inside the residence. Furthermore, the officers chose to execute the warrant in the early morning hours – a time when residents are typically home. *See Anderson v. Campbell*, No. 95-6459, 104 F.3d 367, 1996 WL 731244, at *3 (10th Cir. Dec. 20, 1996) ("the record indicates that the officers came to the home at 8:45 p.m., on a cold, snowy evening, a time when a person would reasonably be expected to be at home."). Finally, when the woman who answered the door was asked if Thompson was there, she muttered "um" and motioned with her head over her right shoulder. Sgt. Roberts, the officer at the door, interpreted this response as indicating that Thompson was inside and behind her. Given the totality of this information, we conclude the officers reasonably believed that Thompson was inside the residence at the time of entry. Accordingly, this prong is satisfied.

## CONCLUSION

For the reasons stated above, we find no error in the district court's denial of Thompson's motion to suppress. Accordingly, we AFFIRM the district court's judgment.

Entered for the Court

Christine M. Arguello
District Judge

16