NOT DESIGNATED FOR PUBLICATION

No. 115,248

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

CHRISTOPHER COTY MAIER,
*Appellee*.

MEMORANDUM OPINION

Appeal from Douglas District Court; SALLY D. POKORNY, judge. Opinion filed September 22, 2017. Affirmed in part and reversed in part.

*Patrick Hurley*, assistant district attorney, *Eve Kemple*, senior assistant district attorney, *Charles E. Branson*, district attorney, and *Derek Schmidt*, attorney general, for appellant.

*Dakota T. Loomis*, of Law Office of Dakota Loomis, LLC, of Lawrence, for appellee.

Before SCHROEDER, P.J., POWELL and GARDNER, JJ.

GARDNER, J.: This appeal by the State challenges the district court's suppression of evidence police found while searching Christopher Coty Maier's hotel room after executing an arrest warrant there for Maier's girlfriend. The district court also suppressed post-*Miranda* statements Maier made after being arrested pursuant to his own warrant. We affirm the suppression of the evidence found in the hotel room but reverse the suppression of Maier's post-*Miranda* statements.

*Factual and procedural background*

In the afternoon of December 19, 2014, Lawrence police officers Tracy Russell, Brian Wonderly, and Kenneth Rodgers observed a maroon van in the parking lot of the Rodeway Inn. Officer Russell knew the van belonged to Amanda Lucas and that Lucas had an active bench warrant out for her arrest. The information from the in-car warrant alert identified it as a warrant for failure to appear but did not indicate whether it was for a criminal or civil case. Officer Russell assumed it was a criminal warrant due to his previous contact with Lucas. He later learned it was a bench warrant related to her child support case.

The officers went inside the motel to arrest Lucas but did not find her name on the guest register. They then went door-to-door to see if they could hear any activity inside the occupied rooms. The officers stopped at Room 233 after they heard several people inside the room being "quite boisterous." One of the females in the room referred to another female as "Amanda," and the officers heard them discussing borrowing money for a drug transaction. The officers waited outside the room for approximately 30 minutes listening to the conversation.

The door to the room then opened, and Crystal White exited. When Officer Russell asked her if Lucas was inside the room, she stepped aside and nodded toward one of the beds. Although the officers did not ask White if they could enter, they interpreted her gesture as an invitation to enter the room. They entered the room, saw several people, identified Lucas, and then arrested her pursuant to the warrant.

One officer saw a large serrated knife on the bed so he ordered Maier to stand with his hands against the wall for officer safety. An officer stood right behind him. Within a minute after Lucas' arrest, Officer Russell asked Maier if he had rented the room and whether he had any personal property in the room. Officer Russell asked Maier what

2

items in the room belonged to him, and Maier pointed to several bags, a Honeywell safe, the knife, and a computer. Officer Russell asked if he could look in the safe, and Maier gave permission, saying nothing was in the safe. Maier provided a key to Officer Russell who opened the safe and found a digital scale, several watches, some rings, and approximately $70 in cash. Officer Russell asked Maier about the scale, and Maier claimed it belonged to another individual who had been in the room earlier in the day.

Officer Russell then asked to search the hotel room and Maier said, "[y]ou can search the whole thing." Officer Russell located a baggie, a clear glass jar that contained a white powdery substance, and a smoking pipe.

At some point, Officer Rodgers took Maier outside the room into the hall to try to identify him. Maier gave him the false name of Timothy West, a false date of birth, and said his driver's license was from Colorado. When Officer Rodgers was unable to find any information about Timothy West in Colorado, he asked one of the persons present who the defendant was and she replied it was Christopher Maier. Officer Rodgers, who had had prior contact with Maier, then asked dispatch to run Maier's real name and was informed by dispatch of a warrant for Maier's arrest. Maier was then arrested.

Officer Russell took Maier to the patrol car and gave him his *Miranda* rights. Maier agreed to waive his rights and made the following statements to Officer Russell:

- White had asked him to loan her $125 so she could purchase some high quality methamphetamine;

- The jar the methamphetamine was in belonged to Maier but the low quality methamphetamine in the jar belonged to White;

- Maier had smoked some of the methamphetamine when White was in the room; and

3

- When Maier heard the police arrive he stashed the methamphetamine and pipe under the mattress.

Maier later moved to suppress the physical evidence and his statements. The district court initially denied that motion but then granted Maier's motion to reconsider, suppressing the evidence. The State then moved to reconsider the suppression, but the district court denied that motion.

The State takes this interlocutory appeal from the order suppressing evidence and shows that its inability to use that evidence substantially impairs its ability to prosecute the case. See *State v. Newman*, 235 Kan. 29, 35, 680 P.2d 257 (1984).

*Our standard of review*

We apply a mixed standard of review to decisions to suppress evidence. We determine, without reweighing the evidence, whether the facts underlying the district court's decision are supported by substantial competent evidence. We then conduct a de novo review of the district court's legal conclusion drawn from those facts. *State v. Morton*, 286 Kan. 632, 638-39, 186 P.3d 785 (2008).

*General Fourth Amendment principles applicable to searches based on arrest warrants*

The Fourth Amendment to the United States Constitution prohibits unreasonable government searches and seizures. The "'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Payton v. New York,* 445 U.S. 573, 585, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980). A search and seizure of evidence conducted without a warrant is "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated

4

exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967).

Generally, the Fourth Amendment provides overnight guests in motels the same expectation of privacy rights afforded to citizens in the home. *State v. Chiles*, 226 Kan. 140, 146-47, 595 P.2d 1130 (1979); see *Minnesota v. Olson*, 495 U.S. 91, 96-97, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990). Our case involves the search of a hotel room based solely on an arrest warrant. The United States Supreme Court has clarified the law as to the search of a residence based solely on an arrest warrant in two cases: *Payton*, 445 U.S. 573, and *Steagald v. United States*, 451 U.S. 204, 101 S. Ct. 1642, 68 L. Ed. 2d 38 (1981). We apply that law here.

An arrest warrant carries with it, by implication, a limited grant of authority to enter the target's residence so long as there is reason to believe that the target is inside. See *Payton*, 445 U.S. at 603. Here, officers had a facially valid arrest warrant for the target. As the United States Supreme Court emphasized in *Payton*, "the existence of an arrest warrant provides a buffer between the suspect and the zealous officer." *State v. Thomas*, 280 Kan. 526, 539, 124 P.3d 48 (2005). But officers have no authority to enter the residence of a third party to serve an arrest warrant on a suspect unless the officers have a valid search warrant to enter the residence. *Steagald*, 451 U.S. at 213-16. Generally speaking, these principles extend to the target's hotel or motel room, since such an accommodation is akin to a temporary residence. See *Stoner v. California*, 376 U.S. 483, 490, 84 S. Ct. 889, 11 L. Ed. 2d 856 (1964); *United States v. Beaudoin*, 362 F.3d 60, 65 (1st Cir. 2004).

*Payton* "'requires a two-part inquiry: first, there must be a reasonable belief that the location to be searched is the suspect's dwelling, and second, the police must have "reason to believe" that the suspect is within the dwelling.'" *State v. Beal*, 26 Kan. App. 2d 837, 840, 994 P.2d 669 (2000). To satisfy the *Payton* test, the officers must have a

5

"reasonable belief" the arrestee lives in the residence, not merely a "reasonable suspicion" necessary to justify a "stop and frisk" under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). *United States v. Gay*, 240 F.3d 1222, 1227 (10th Cir. 2001).

As a preliminary matter, we must decide whether we should apply the *Payton* (suspect's home) or *Steagald* (third-party's home) standard to evaluate the lawfulness of the officers' entry into Maier's hotel room. We resolve this question under the first prong of the *Payton* test. *Gay*, 240 F.3d at 1226; *United States v. Thompson*, 402 Fed. Appx. 378, 382 (10th Cir. 2010) (unpublished opinion).

> "If the officers reasonably believe the suspect lives at the residence, then *Payton* applies. The officers may enter on the authority of the arrest warrant, provided they reasonably believe the suspect is inside. They do not need a search warrant. If, however, the officers' belief that the suspect lives at the residence is not reasonable, then this implies the residence is a third-party residence. In that case, *Steagald* applies, i.e., the officers' arrest warrant is insufficient—they need a search warrant to enter." *Thompson*, 402 Fed. Appx. at 382.

We evaluate whether the officers had a reasonable belief by using the totality of the circumstances test. *Beal*, 26 Kan. App. 2d at 840.

*Did the officers have a reasonable basis to believe that Lucas was staying in Room 233?*

We thus examine whether the officers reasonably believed, on the date they went to the hotel to arrest Lucas, that Lucas was staying at the Rodeway Inn. The facts known to the police officers about Lucas' status before they entered Room 233 are few. The officers knew that Lucas had been removed from the house she previously lived in and was staying wherever she could, including motel rooms. They knew that she had been arrested at the same Rodeway Inn two weeks before the event in question. On the date of the search, at mid-afternoon, officers saw Lucas' van parked in the parking lot of the

6

Rodeway Inn. They determined that Lucas was not a registered guest, then wandered the halls and heard someone in Room 233 say Lucas' first name. These facts, although sufficient to warrant a reasonable belief that Lucas was inside Room 233, were insufficient to warrant a reasonable belief that Lucas was staying there overnight.

The State cites Lucas' testimony regarding her on-again, off-again romantic relationship with Maier and her history of sometimes living at her home and sometimes staying with Maier. Lucas did testify that on the date of the search she was homeless, was living at the Rodeway Inn, had met Maier there that morning, they had no plans where they were going, but she "always goes back to him, so [she] would have stayed with him." But whether Lucas was actually residing in Maier's room is not determinative, as our focus is on what the officers reasonably believed at the time of their entry into the room. The record does not reflect that the officers were aware of Lucas' relationship with Maier before they entered the room. Nor did the officers even know Maier, who had registered under the name Timothy West, was staying at the hotel until after they entered the room, arrested Lucas, searched the room, and learned Maier's true identity.

The State relies on *United States v. Kern*, 336 Fed. Appx. 296, 297 (4th Cir. 2009) (unpublished opinion). But there, "several confidential sources" had informed law enforcement officers that a man, woman, and two children fitting the description of Kern's family had been observed for several weeks coming and going from a farm in Tyler County, West Virginia. Sources were unclear as to the owner of the property but believed it was an heirship. Based on that information, officers went to the farm to execute valid outstanding arrest warrants for Kern and found him there. It was undisputed that Kern, the target of the warrant, was either a resident or an overnight guest at the farm, thus the *Payton* requirement was met. *Kern*, 336 Fed. Appx. at 298. Such is not the case here.

7

The facts in our case are skinnier than those in cases which have found the requisite reasonable belief. See, e.g., *United States v. Jones*, 523 F.3d 31, 37 (1st Cir. 2008) (hotel manager told officers that suspect had rented a particular room for three weeks and a man detained in the parking lot told officers that suspect was then inside the suite); *United States v. Pelletier*, 469 F.3d 194, 197, 200-01 (1st Cir. 2006) (officers who went to defendant's home were told he was not there; defendant's girlfriend's sister said he was at a certain room at a motel; the room was registered in the sister's name; and a motel maintenance worker identified the defendant as the sole occupant of the room); *Thompson*, 402 Fed. Appx. at 386 (presence of suspect's vehicle over multiple days and throughout the night at one residence and information that suspect was staying there was sufficient to form a reasonable belief that suspect was living there).

The district court properly determined that the officers did not have a reasonable basis to believe that Lucas was a resident of Room 233. Thus, the officers needed a search warrant to enter Maier's third-party room to arrest Lucas there pursuant to her arrest warrant. See *Steagald*, 451 U.S. at 213-16.

The State contends that even if the officers' entry violated the Fourth Amendment, the evidence should not be suppressed. "Exclusion is 'not a personal constitutional right,' nor is it designed to 'redress the injury' occasioned by an unconstitutional search." *Davis v. United States*, 564 U.S. 229, 236, 131 S. Ct. 2419, 180 L. Ed. 2d 285 (2011). Instead, "[t]he rule's sole purpose . . . is to deter future Fourth Amendment violations." *Davis*, 564 U.S. at 236-37. Whether to apply the remedy of exclusion or not ultimately "depend[s] on the circumstances of the particular case." *United States v. Leon*, 468 U.S. 897, 923, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). See 468 U.S. at 922 n.23 ("In making this determination, all of the circumstances . . . may be considered."); 468 U.S. at 924-25 ("[C]ourts have considerable discretion in conforming their decisionmaking processes to the exigencies of particular cases."). The State asserts two exceptions to the exclusionary rule:  good faith and the attenuation doctrine. We address the latter first.

*Did the district court err in finding that the attenuation doctrine did not apply?*

The State argues that even if the officers' entry was illegal the evidence should not be suppressed, relying on the attenuation doctrine. The State argues that three intervening events separated the officers' illegal entry from the evidence they discovered thereafter: (1) Maier consented to the search; (2) Maier provided false identifying information to the officers; and (3) the officers, upon learning Maier's true identity, discovered an outstanding bench warrant for his arrest.

*The attenuation doctrine, generally*

Under the attenuation doctrine, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.' *Hudson,* [547 U.S.] at 593, 126 S. Ct. 2159." *Utah v. Strieff*, 579 U.S. __, 136 S. Ct. 2056, 2061, 195 L. Ed. 2d 400 (2016). See S*tate v. Martin*, 285 Kan. 994, 1003, 179 P.3d 457 (2008) (applying attenuation doctrine). The determination of dissipation is heavily fact-bound and, thus, dependent upon case-specific circumstances. See *State v. Swanigan*, 279 Kan. 18, 44, 106 P.3d 39 (2005).

To determine whether a sufficient intervening event breaks the causal chain between the unlawful act and the discovery of drug-related evidence, we examine a number of factors articulated in *Brown v. Illinois*, 422 U.S. 590, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975), and cited by our Kansas Supreme Court in *Swanigan*, 279 Kan. at 43:

- The "temporal proximity" between the unconstitutional conduct and the discovery of evidence, *Brown*, 422 at 603;

9

- the presence of intervening circumstances, *Brown*, 422 at 603-04;

- the purpose and flagrancy of the official misconduct, *Brown*, 422 at 604; *Strieff*, 136 S. Ct. at 2061-62;

- a change in place, *Swanigan*, 279 Kan. at 42;

- the involvement of different law enforcement officers, *Swanigan*, 279 Kan. at 42;

- whether the suspect received *Miranda* warnings before making the incriminating statements, *Brown*, 422 U.S. at 603; *Kaupp v. Texas*, 538 U.S. 626, 633, 123 S. Ct. 1843, 155 L. Ed. 2d 814 (2003); *State v. Little*, No. 104,794, 2012 WL 3000342, at *5 (Kan. App. 2012) (unpublished opinion) (finding sufficient attenuation).

The State contends that the district court erred in finding insufficient attenuation because it analyzed only one factor—temporal proximity. We examine all the factors below.

Miranda *warnings*

We begin with the latter factor first. This factor does not apply to the physical evidence found in the search of the hotel room before Maier was given the *Miranda* warnings but applies to Maier's statements. It is undisputed that Maier's statements were made after he was arrested and given his *Miranda* warnings, over an hour after the officers entered his hotel room.

Providing *Miranda* warnings is an "important, although not dispositive," factor that weighs against suppression of Maier's subsequent statements. *Rawlings v. Kentucky*, 448 U.S. 98, 107, 100 S. Ct. 2556, 65 L. Ed. 2d 633 (1980). Even persons who are arrested illegally will often decide to confess as an act of free will, unaffected by the initial illegality. 448 U.S. at 106. Maier was not arrested illegally and has not shown that

his post-*Miranda* statements made after his arrest pursuant to a valid arrest warrant were somehow affected by the officer's initial entry into his hotel room. This factor favors the admission of Maier's statements.

*Temporal proximity*

The search of the hotel room occurred soon after officers entered it. Officer Russell testified that it took one to two minutes to arrest Lucas on the warrant and "then our focus turned to Mr. Maier and asked him for consent to search the room." The district court found that while one officer was arresting Lucas, "exactly at that same time," other officers started talking to Maier, who "starts pointing out what [property] is his and consenting to the search." The district court found that the arrest and search were "so intertwined and intermeshed that I cannot find that there is any separation from the unlawful entry and the immediate search of the room."

But Maier's false identification was made at some unspecified time after the search, and his post-*Miranda* statements in the patrol car were made approximately an hour and a half after the initial entry into his hotel room. The district court recognized that Maier's statements after his arrest and reading of his *Miranda* rights were arguably attenuated but found that the statements would not have been made had the officers not illegally entered the room and illegally searched it.

That is not the proper test for attenuation, however. The Supreme Court has rejected a "but for" test for determining whether evidence is a fruit of unlawful police activity. *Wong Sun v. United States*, 371 U.S. 471, 487-88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). The "more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" 371 U.S. at 488. See *State v. Poulton*, 286 Kan. 1, 6, 179 P.3d 1145

11

(2008) ("Although not all evidence is fruit of the poisonous tree simply because it would not have become known without the illegal actions of the police, the doctrine bars any evidence that becomes known through exploitation of the illegality.").

The Supreme Court has cautioned that the temporal proximity factor favors attenuation only if a substantial time has elapsed between the conduct and the discovery of evidence, and has found less than two hours insubstantial. *Kaupp*, 538 U.S. at 633; see *Brown*, 422 U.S. at 604 ("less than two hours," no attenuation). Here, less than two hours separated all the intervening events from the initial entry. We thus agree that the temporal proximity between the unconstitutional conduct and the discovery of evidence favors suppression of the evidence.

*Intervening circumstances*

The State argues that three intervening events severed the connection between the initial illegality and the discovery of evidence:  (1) Maier's consent to the search; (2) Maier's provision of a false identity to the officers; and (3) the officers' discovery of an outstanding bench warrant for his arrest. We find the third event significant.

1)  *Maier's consent*

To vitiate the unlawfulness of an entry, consent to a search must be both voluntary and "an intervening independent act of a free will" sufficient "to purge the primary taint of the unlawful invasion." *Brown*, 422 U.S. at 598. Thus evidence obtained by purported consent should be held admissible only if it is determined that the consent was both voluntary and not an exploitation of the prior illegality. *United States v. Melendez-Garcia*, 28 F.3d 1046, 1054 (10th Cir. 1994); *State v. Schmitter*, 23 Kan. App. 2d 547, 556, 933 P.2d 762 (1997) (adopting the dual analysis articulated in *Melendez-Garcia*).

12

The district court found the consent involuntary based on the following facts: (1) the motel room was very small; (2) at least four people other than officers were in the room; (3) at least two officers were in the room and one was at the door; (4) all of the officers were in uniform and were armed; and 5) Maier was not advised that he could refuse consent or that he could leave. The record also shows that Maier was quickly told to stand with his hands against the wall because an officer standing "right behind" him ordered him to do so for officer safety after seeing a large serrated knife on the bed. The record contains sufficient evidence to support the district court's conclusion that Maier's consent to the search of his room was not voluntary under the totality of the circumstances, including the fact that Maier's consent was requested soon after the illegal entry to his room. Maier's consent thus cannot serve as a valid attenuating event. See *Melendez-Garcia*, 28 F.3d at 1054.

2) *Maier's false identification*

The State asserts that Maier's falsely identifying himself to the officers constitutes an intervening event, separating the illegal entry from the discovery of incriminating evidence. The State relies on the following facts:  Maier repeatedly provided a false name and a false date of birth to officers; Maier said his driver's license was from Colorado; and when Officer Rodgers was unable to find any information about the defendant in Colorado he asked White who he was and she told him Maier's real name.

The State does not show how defendant's falsely identifying himself to the police constitutes an intervening event. The State does not argue, for example, that by doing so Maier committed a crime in their presence, warranting his arrest and a search pursuant to a valid arrest. Instead, the State fails to relate the facts to any legal argument or to cite any authority showing that these facts necessarily constitute sufficient attenuation. Failure to support a point with pertinent authority or show why it is sound despite a lack

13

of supporting authority amounts to an abandonment of the issue. *State v. Murray*, 302 Kan. 478, 486, 353 P.3d 1158 (2015). We consider this argument to be abandoned.

3) *The officers' discovery of an outstanding bench warrant for Maier's arrest*

The State also contends that the officers' discovery of an outstanding bench warrant for Maier's arrest constitutes an intervening event. The arrest warrant was discovered before Maier's statements but after the search revealed physical evidence. The warrant thus cannot serve as an intervening event as to anything but Maier's subsequent statements.

The district court's comments in relation to Maier's statements reveal the district court's erroneous understanding that a "but for" test was appropriate in determining attenuation:

> "[O]nce you've already said, 'Oh, yeah, that is mine; oh yeah, my gosh, there is digital scales there; yeah, I guess there is methamphetamine there,' once you basically have confessed in the motel room, the officers can't just wait and question you again and say, 'That is sufficiently attenuated.' . . . But [Maier] wouldn't have had to explain[] more if the officers were not there unlawfully in the first place."

As we noted above, the court's use of a "but for" test constitutes a legal error in its attenuation analysis. See *Hudson v. Michigan*, 547 U.S. 586, 593, 126 S. Ct. 2159, 165 L. Ed. 2d 56 (2006) (finding attenuation "occurs when, *even given a direct causal connection*, the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained" [Emphasis added.]); *Wong Sun*, 371 U.S. at 487-88 (rejecting a "but for" test for determining whether evidence is a fruit of unlawful police activity).

14

The district court's comments also reflect a factual error: as the State correctly asserts and defendant tacitly concedes in his brief, Maier made no incriminating statements in the hotel room. His statements were made in the patrol car to Officer Russell after Maier was arrested and was read his *Miranda* rights. Maier was thus in a different place—in a patrol car outside and not in the hotel room—and was with just one instead of several officers who had entered his room. He made the statements after officers discovered an arrest warrant for him, arrested him, and read him *Miranda* warnings.

The State has filed a notice of additional authority on this topic, citing *Strieff*. Although the State's notice was untimely, the State gave a good reason for its delay. Maier has not objected to our consideration of *Strieff*, and *Strieff* merely applied the preexisting attenuation doctrine. We thus consider this additional authority.

*Strieff* held that an officer's discovery of a valid, preexisting arrest warrant was enough to break the causal link between an unlawful investigatory stop and drug-related evidence seized from a defendant during a search incident to arrest, abrogating *State v. Moralez*, 297 Kan. 397, 300 P.3d 1090 (2013) (which found that a warrant is of minimal importance in the attenuation analysis):

> "[W]e hold that the evidence discovered on Strieff's person was admissible because the unlawful stop was sufficiently attenuated by the pre-existing arrest warrant. Although the illegal stop was close in time to Strieff's arrest, that consideration is outweighed by two factors supporting the State. The outstanding arrest warrant for Strieff's arrest is a critical intervening circumstance that is wholly independent of the illegal stop. The discovery of that warrant broke the causal chain between the unconstitutional stop and the discovery of evidence by compelling Officer Fackrell to arrest Strieff. And, it is especially significant that there is no evidence that Officer Fackrell's illegal stop reflected flagrantly unlawful police misconduct." *Strieff*, 136 S. Ct. at 2063.

15

We find *Strieff* applicable here. Even though the initial entry violated *Payton*, Maier's statements made after his arrest based on a valid warrant and made voluntarily outside the hotel after waiving his *Miranda* rights should not have been suppressed. The discovery of Maier's arrest warrant broke the causal chain between the unconstitutional entry and Maier's post-*Miranda* statements.

We find further support in *New York v. Harris*, 495 U.S. 14, 110 S. Ct. 1640, 109 L. Ed. 2d 13 (1990). There, the United States Supreme Court held that "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside his home, even though the statement is taken after an arrest made in the home in violation of *Payton*." 495 U.S. at 21. In *Harris*, officers unlawfully entered the defendant's home—with probable cause but without consent or a warrant—to arrest the defendant in connection with a murder. While the police were in his house during the warrantless entry, the defendant made incriminating statements in response to their questions. After the officers brought the defendant to the station, the defendant drafted a written confession. At trial, the defendant sought to suppress the written confession on the grounds that it was fruit of the unlawful entry into his home. The trial court suppressed the statements made in the home but not the written confession made at the police station.

The Supreme Court affirmed the admission into evidence of the subsequent custodial statement, explaining that the custodial statement was admissible because it was "not the fruit of the fact that the arrest was made in the house rather than somewhere else." *Harris*, 495 U.S. at 20.

> "To put the matter another way, suppressing the statement taken outside the house would not serve the purpose of the rule that made Harris' in-house arrest illegal. The warrant requirement for an arrest in the home is imposed to protect the home, and anything incriminating the police gathered from arresting Harris in his home, rather than

16

elsewhere, has been excluded, as it should have been; the purpose of the rule has thereby been vindicated. We are not required by the Constitution to go further and suppress statements later made by Harris in order to deter police from violating *Payton*. . . . Even though we decline to suppress statements made outside the home following a *Payton* violation, the principal incentive to obey *Payton* still obtains: the police know that a warrantless entry will lead to the suppression of any evidence found, or statements taken, inside the home. If we did suppress statements like Harris', moreover, the incremental deterrent value would be minimal." 495 U.S. at 20.

The Supreme Court explained these justifications for admission of evidence in spite of a violation in *Hudson. Hudson* held that the exclusionary rule did not require suppression of the evidence when the interests to be protected, and which were violated, had nothing to do with the seizure of the evidence. 547 U.S. at 594. Such is the case here. This factor strongly favors admission of Maier's statements.

*The purpose and flagrancy of the official misconduct*

The flagrancy of police misconduct is the most important element of our analysis because the exclusionary rule is aimed at deterring police misconduct. *United States v. Reed*, 349 F.3d 457, 464-65 (7th Cir. 2003) (citing *Brown*, 422 U.S. at 600). "The third factor of the attenuation doctrine reflects that rationale by favoring exclusion only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant." *Strieff*, 136 S. Ct. at 2063.

"'[P]urposeful and flagrant' misconduct is not limited to situations where the police act in an outright threatening or coercive manner." *Reed*, 349 F.3d at 465.

"Rather, purposeful and flagrant misconduct is generally found where: '(1) the impro                                     impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed "in the hope that

17

something might turn up.'" *United States v. Simpson,* 439 F.3d 490, 496 (8th Cir. 2006) (quoting *Brown,* 422 U.S. at 605, 95 S. Ct. 2254)." *United States v. Fox*, 600 F.3d 1253, 1261 (10th Cir. 2010).

"When an officer's conduct is negligent but not flagrant or purposeful, the exclusionary rule's objective is not served and strongly favors admissibility. *Id*. Good-faith mistakes, resulting from errors in judgment, 'hardly rise to a purposeful or flagrant violation of . . . Fourth Amendment rights.' *Id*." *McDaniel v. Polley*, 847 F.3d 887, 896 (7th Cir. 2017) (citing *Strieff*, 136 S. Ct. at 2063). Even an unreasonable mistake alone is not sufficient to establish flagrant misconduct. *United States v. Herrera-Gonzalez*, 474 F.3d 1105, 1113 (8th Cir. 2007). Nor is a recklessly untrue statement by an officer necessarily flagrant. *United States v. Yorgensen*, 845 F.3d 908, 915 (8th Cir. 2017) (finding an officer's recklessly untrue statement in a probable cause affidavit in support of a search warrant not purposeful or flagrant).

A good-faith mistake was found in *Strieff*, where an officer stopped Strieff leaving a suspected drug house without reasonable suspicion of wrongdoing. The court found that the officer violated Strieff's Fourth Amendment rights and should have asked Strieff to talk instead of demanding that he do so. Despite that violation, the court concluded that this prong of the *Brown* test was not satisfied because the officer made a good-faith mistake and did not act purposefully or flagrantly. "[A]ll the evidence suggests that the [arrest] was an isolated instance of negligence that occurred in connection with a bona fide investigation." *Strieff*, 136 S. Ct. at 2063.

The same rationale applies here. The officers entered the motel room without the necessary reasonable belief that Lucas was living there. Their belief that she was living there was thus objectively unreasonable. But this does not mean that the officers' conduct was flagrant or for an improper purpose. We do not conflate the standard for an illegal entry of a residence for purposes of an arrest warrant with the standard for flagrancy.

18

Instead, we recognize that the officers' determination of where a suspect lives is not always simple. For example, what if a person lives at more than one dwelling? "The *Payton/Steagald* distinction does not lend itself to resolving the situation where a suspect lives in more than one dwelling." *Thompson*, 402 Fed. Appx. at 383. Here, the officers knew that their suspect was homeless and living various places. And how is an officer to determine whether a particular residence is that of the suspect or is instead that of a third party? Residences can rarely be neatly divided into those that are third-party residences and those that are suspects' residences. 402 Fed. Appx. at 385 (citing *Valdez v. McPheters*, 172 F.3d 1220, 1225 [10th Cir. 1999]) ("*Payton* and *Steagald* cannot be understood to divide the world into residences belonging solely to the suspect on the one hand, and third parties on the other."). This is particularly so for short-term residences, such as hotels.

"For the violation to be flagrant, more severe police misconduct is required than the mere absence of proper cause for the seizure. See, e.g., *Kaupp*, 538 U.S. at 628, 633, 123 S. Ct. 1843 (finding flagrant violation where a warrantless arrest was made in the arrestee's home after police were denied a warrant and at least some officers knew they lacked probable cause)." *Strieff*, 136 S. Ct. at 2064. Here, neither the officers' alleged purpose (to arrest Lucas pursuant to her arrest warrant) nor the flagrancy of their violation (entering a third-party's motel room which they erroneously believed to be Lucas' room) rises to a level of misconduct sufficient to warrant suppression. See *McDaniel*, 847 F.3d at 896 (finding no flagrant acts where officer's mistake, if any, in illegally arresting the defendant constituted negligence, and everything that occurred after the initial arrest was legal). Nothing in the record suggests the officers' actions were taken in bad faith or were motivated by an intent to circumvent the strictures of the Fourth Amendment. This factor weighs in favor of admitting Maier's statements.

*Sufficient attenuation has been shown as to Maier's statements*

Our weighing of the relevant factors persuade us that although the physical evidence found in the hotel room was the product of the illegal entry into the hotel room, Maier's statements made in the patrol car were not. Maier was in custody pursuant to a valid arrest warrant at the time. Neither were his statements the fruit of having been arrested in his hotel rather than someplace else. Here, as in *Harris*, 495 U.S. at 19, defendant's post-*Miranda* statements were not made due to an exploitation of the illegal entry into his residence. See *State v. Koutsogiannis*, No. A-5772-14T4, 2017 WL 2471029, at *8 (N.J. Super. 2017) (unpublished opinion) (finding even if the entry of the residence was unlawful, the statements from defendant as well as the items recovered pursuant to the search warrants would not be "poisoned fruit" and subject to the exclusionary rule); *People v. Garcia*, 74 N.E.3d 108, 116 (Ill. App. 2017) (holding where officers had probable cause to effectuate defendant's arrest, and while their entry into his home to do so was unlawful under *Payton*, the evidence recovered outside his home was not required to be suppressed), *reh. denied* March 21, 2017; *Kerr v. Jones*, No. 5:15CV6-WS/CAS, 2017 WL 1158249, at *13 (N.D. Fla. 2017) (holding because police had probable cause to arrest defendant at the time of the alleged *Payton* violation, his subsequent statement to police made after *Miranda* warnings would not have been suppressed), *report and recommendation adopted*, No. 5:15CV6-WS/CAS, 2017 WL 1147473 (N.D. Fla. 2017); *United States v. Espinoza*, No. 3:15-CR-30077-RAL, 2015 WL 9222570, at *4 (D.S.D. 2015) (unpublished opinion) (finding postarrest statements were sufficiently purged from the existence of any *Payton* violation); *Torres v. State*, 95 Md. App. 126, 131, 619 A.2d 566 (1993) (finding statement given by defendant after police officers entered his girlfriend's motel room without warrant and arrested him was not tainted by officers' unlawful entry into motel room; although warrantless arrest in home or its functional equivalent is invalid absent exigent circumstances, once parties leave protected premises there is clean break in chain of causation). Accordingly, we reverse the determination that Maier's custodial statements should be suppressed.

*Good-faith exception*

The State contends that all the evidence should be admitted because the officers acted in objectively "reasonable reliance" on an arrest warrant for Lucas which was subsequently discovered to be a civil and not a criminal warrant.

The good-faith exception provides that a court should suppress evidence only "if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Herring v. United States*, 555 U.S. 135, 143, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009). The United States Supreme Court has "over time applied [the] 'good-faith' exception across a range of cases" where applying the exclusionary rule would not "yield 'appreciable deterrence.'" *Davis v. United States*, 564 U.S. 229, 237-38, 131 S. Ct. 2419, 180 L. Ed. 2d 285 (2011) (quoting *United States v. Janis*, 428 U.S. 433, 454, 96 S. Ct. 3021, 49 L. Ed. 2d 1046 [1976]). For example, the Court has held that, under the good-faith exception, evidence need not be suppressed where police conduct a search in "objectively reasonable reliance" on a search warrant subsequently deemed invalid, *Leon*, 468 U.S. at 922, on a statute subsequently held unconstitutional, *Illinois v. Krull*, 480 U.S. 340, 360, 107 S. Ct. 1160, 94 L. Ed. 2d 364 (1987), on an arrest warrant that had previously been recalled, *Herring*, 555 U.S. at 136, or on binding precedent that has been overruled, *Davis*, 564 U.S. at 241. See *State v. Powell*, 299 Kan. 690, 700, 325 P.3d 1162 (2014); *State v. Pettay*, 299 Kan. 763, 769, 326 P.3d 1039 (2014); *State v. Daniel*, 291 Kan. 490, 492, 242 P.3d 1186 (2010).

Both parties contend that *Herring* favors their position. We find two barriers to the State's assertion of this exception.

First, to date, the Supreme Court has invoked the "good faith" exception only when the law enforcement officer responsible for the constitutional violation

21

unknowingly relied on errors or statements of law made by others. See *Davis*, 546 U.S. at 238-39 (collecting cases); see also *United States v. Mota*, 155 F. Supp. 3d 461, 475 (S.D.N.Y. 2016) ("The common thread uniting these exceptions is that it was not the officer conducting the search who erred, but another actor, such as the legislature.") (citing *Davis*, 546 U.S. at 240-41). Such is not the case here. The officers who illegally entered the motel room relied on their own collective knowledge to form the erroneous belief that Lucas was living there and do not allege that they relied on erroneous information from others about where Lucas was living.

Secondly, unlike the officers in *Herring* who effected an arrest during a traffic stop and then searched a vehicle incident to arrest, the officers here needed to comply with the *Payton*/*Steagald* requirements for in-home arrests. Officers thus had to show not only their good-faith reliance on the arrest warrant, but also a reasonable basis to believe that Lucas was staying in Room 233 overnight. As we have found, they failed to show the latter. Their entry into Maier's hotel room therefore cannot be justified under the good-faith exception even if their reliance on the facially valid arrest warrant for Lucas was objectively reasonable. See *Thomas*, 280 Kan. at 532 (finding an arrest warrant alone is an insufficient basis to allow entry into a third party's residence). We thus find *Herring's* good-faith exception inapplicable here.

Accordingly, we do not reach the interesting issue whether officers may enter a target's residence to execute a bench warrant. See *United States v. Spencer*, 684 F.2d 220, 223 (2d Cir. 1982) (holding that a bench warrant is the equivalent to a judicial determination of probable cause); *United States v. Smith*, 468 F.2d 381 (3d Cir. 1972) (finding when a defendant is named in a bench warrant, probable cause for arrest exists); *Johnson v. Provenzano*, 646 Fed. Appx. 279, 281 (3d Cir. 2016) (unpublished opinion) (finding "'[t]he simple fact of nonappearance [for his summons] provided . . . probable cause . . . for a bench warrant'"); *Carter v. Baltimore County*, 95 Fed. Appx. 471, 479 (4th Cir. 2004) (unpublished opinion) (finding that once an officer determines that the

22

person is the individual listed on the bench warrant, the officer has "probable cause [and indeed the duty] to serve the warrant and take [the plaintiff] into custody"); cf. *State v. Ruden*, 245 Kan. 95, 103-04, 774 P.2d 972 (1989) (holding officers have no authority to enter a subject's residence to arrest a person on a bench warrant they know is to assist the execution of a judgment in a limited action case); *Thomas*, 280 Kan. at 531 (citing *United States v. Bervaldi*, 226 F.3d 1256 [11th Cir. 2000] [*Payton* rule applies for bench warrants]).

We affirm the district court's suppression of the physical evidence found in the hotel room and reverse the suppression of Maier's statements made outside the hotel room.